**BAILEY FARM DAIRY CO. et al. v. ANDERSON, Secretary of Agriculture.**

No. 13182.

Circuit Court of Appeals, Eighth Circuit.

Sept. 5, 1946.

Writ of Certiorari Denied Dec. 9, 1946.

See 67 S.Ct. 355.

---

William D. Donnelly, of Washington, D. C. (Karl P. Spencer, of St. Louis, Mo., and Max O'Rell Truitt, Mac Asbill, Lawrence Keitt, and Cummings & Stanley, all of Washington, D. C., on the brief), for appellants.

W. Carroll Hunter, Sp. Asst. to Atty. Gen. (George R. Springborg, Atty., U. S. Dept. of Agriculture, of Lincoln, Neb., Katherine A. Markwell, Atty., U. S. Dept. of Agriculture, of Washington, D. C., Wendell Berge, Asst. Atty. Gen., J. Stephen Doyle, Jr., Sp. Asst. to Atty. Gen., and Harry C. Blanton, U. S. Atty., of Sikeston, Mo., on the brief), for appellee.

Before GARDNER, JOHNSEN, and RIDDICK, Circuit Judges.

JOHNSEN, Circuit Judge.

The question is as to the validity of an allocation formula required to be used by handlers in classifying producers' milk in the St. Louis marketing area, under § 903.-3(e) of Federal Milk Order No. 3, as amended [1] December 27, 1943, effective January 1, 1944, which amended order regulated the classification and minimum price to producers of subject milk in the St. Louis, Missouri, marketing area [2] and was

---

[1] 8 Fed.Register 17451, 7 Code of Fed. Regulations, 1943 Supp., § 903.0 et seq.

[2] Under § 903.1(c) of amended Order No. 3, the St. Louis, Missouri, marketing area consisted of the city of St. Louis and certain adjacent territory in Missouri and Illinois.

issued[3] under the provisions of the Agricultural Marketing Agreement Act of 1937.[4] The issue arises out of a petition by 22 handlers of milk in the marketing area for administrative relief[5] from the operation of the formula, an administrative hearing upon the petition and a denial of the relief, an action in the District Court to review the administrative ruling,[6] the upholding of the administrative ruling by that court on summary judgment, and an appeal here from the judgment. The opinion of the District Court is reported in Bailey Farm Dairy Co. v. Jones, 61 F.Supp. 209.

The validity of the Agricultural Marketing Agreement Act itself is not here involved.[7] The object of the Act is, through marketing agreements and orders of the Secretary of Agriculture, "to establish and maintain such orderly marketing conditions for agricultural commodities in interstate commerce as will establish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period,"

which the statute prescribes. 7 U.S.C.A. §§ 602(1), 608e. It thus is a measure intended primarily to benefit producers. Waddington Milk Co. v. Wickard, 2 Cir., 140 F.2d 97, 101.

As to milk and milk products, the Act further declares that, in fixing prices to producers in any marketing agreement or order, "The level of prices which it is * * * the policy of Congress to establish * * * shall * * * be such level as will reflect the price of feeds, the available supplies of feeds, and other economic conditions which affect market supply and demand, for milk or its products in the marketing area," and the Secretary of Agriculture is authorized, on hearing, evidence and findings, to "fix such prices as he finds will reflect such factors, insure a sufficient quantity of pure and wholesome milk, and be in the public interest." 7 U.S.C.A. § 608c(18).

The Act recognizes that the factors which affect the problem vary in different production and marketing areas and that the question therefore is one that must be dealt with regionally on the basis of the particular conditions. The Secretary of

---

[3] The Secretary of Agriculture's powers under the statute to issue and amend marketing orders, 7 U.S.C.A. § 608c(1), and his other functions in relation to such orders, were by Executive Order, No. 9322, as amended, 50 U.S.C.A.Appendix, § 601 note, 8 F.R. 3807, 8 F.R. 5423, 8 F.R. 14783, authorized to be performed by the War Food Administrator and were in turn redelegated to the Assistant War Food Administrator, 8 F.R. 13871. The amended order here involved was issued by the Acting War Food Administration, but the War Food Administration has since been terminated and its functions transferred back to the Secretary of Agriculture, 10 F.R. 8087, and the Secretary of Agriculture is accordingly the sole appellee here.

[4] 50 Stat. 246, 7 U.S.C.A. § 601 et seq.

[5] 7 U.S.C.A. § 608c(15):

(A) "Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such pe-

tition, in accordance with regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law."

[6] Id.:

(B) "The District Courts of the United States (including the district court of the United States for the District of Columbia) in any district in which such handler is an inhabitant, or has his principal place of business, are hereby vested with jurisdiction in equity to review such ruling, provided a bill in equity for that purpose is filed within twenty days from the date of the entry of such ruling. * * * If the court determines that such ruling is not in accordance with law, it shall remand such proceedings to the Secretary with directions either (1) to make such ruling as the court shall determine to be in accordance with law, or (2) to take such further proceedings as, in its opinion, the law requires. * * * "

[7] The Supreme Court has passed upon the validity of the Act in United States v. Rock Royal Co-operative, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446.

Agriculture is accordingly forbidden to issue any order of general application to a commodity or product unless he "finds that the issuance of several orders applicable to the respective regional production areas or regional marketing areas, or both, as the case may be, of the commodity or product would not effectively carry out the declared policy" of Congress, and he is directed, "so far as practicable, [to] prescribe such different terms, applicable to different production areas and marketing areas, as [he] finds necessary to give due recognition to the differences in production and marketing of such commodity or product in such areas." 7 U.S.C.A. § 608c(11) (A) and (C).

Certain legislative prescriptions and prohibitions are, however, made as to some commodities or products. "In the case of milk and its products,", provides 7 U.S.C.A. § 608c(5), "orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7)) [8] no others:

"(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of

such milk, or any use classification thereof, is made to such handlers.

"(B) Providing:

"(i) for the payment to all producers and associations of producers delivering milk to the same handler of uniform prices for all milk delivered by them [9] * * *; or

"(ii) for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered; [10] subject, in either case, only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk delivered, (c) the locations at which delivery of such milk is made, and (d) a further adjustment, equitably to apportion the total value of the milk purchased by any handler, or by all handlers, among producers and associations of producers, on the basis of their marketings of milk during a representative period of time. * * *

"(G) No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States."

The first attack that is made here upon the allocation formula in § 903.3(e) of Order No. 3, as amended, is that the formula contains terms and conditions beyond those which the foregoing provisions of 7 U.S.C.A. § 608c (5) authorize. The exact language of the allocation formula is set out in a footnote,[11] and a summary of its opera-

---

[8] The provisions of subsection (7), 7 U.S.C.A. § 608c(7), are not here material, except paragraph (D), which authorizes terms and conditions "Incidental to, and not inconsistent with, the terms and conditions specified in subsections (5) * * * and (7) and necessary to effectuate the other provisions of such order."

[9] This represents what is commonly referred to as an individual-handler pool.

[10] This represents what is commonly referred to as a market-wide pool.

[11] § 903.3(e): "Classification of Producer Milk. The market administrator shall determine the classification of milk received by each handler from producers as follows:

(1) Subtract from the total pounds of milk in each class the total pounds of milk, skim milk, and cream received from other handlers and allocated to such class pursuant to (c) of this section;

(2) Subtract from the remaining pounds of Class I milk the pounds of ungraded milk received from sources other

tive effect is all that is necessary for present purposes. In order, however, to understand the operation of the formula, it may be helpful to refer first to the general scheme of the amended order and to some of its other provisions.

Order No. 3, as amended, attempts, as we have heretofore suggested, to regulate the classification of producers' milk by handlers in the St. Louis marketing area, for price-payment purposes to producers, and to prescribe the minimum prices to be paid by handlers for the milk falling under each classification. The terms "producer" and "handler" are defined for purposes of the order as follows: " 'Producer' means any person, irrespective of whether such person is also a handler, who produces, under a dairy farm permit or rating issued by the proper health authorities for the production of Grade A or Grade B raw milk, milk which is received at a plant from which milk is disposed of as fluid milk in the marketing area. As used herein such 'dairy farm permit or rating' means one issued by any of the health authorities[12] duly authorized to administer regulations governing the quality of milk disposed of in the marketing area." " 'Handler' means any person who, on his own behalf or on behalf of others, receives milk from producers, associations of producers, or other handlers, all, or a portion, of which milk is disposed of as fluid milk in the marketing area, and who, on his own behalf or on behalf of others, engages in such handling of milk as is in the current of interstate commerce or which directly burdens, obstructs, or affects interstate commerce in milk and its products. This definition shall not be deemed to include any person who is a handler under another Federal milk marketing agreement or order if such handler does not operate a plant from which bottled milk is distributed in the St. Louis, Missouri, marketing area." § 903.1(e) and (f), respectively.

The order provides for the classification of milk into two classes, in accordance with the utilization of that commodity made by a handler. In general, Class I consists of milk utilized for fluid milk, and Class II consists of milk utilized for cream or other milk products. § 903.3(b). A minimum price[13] is provided for each of the two classes, the price payable for milk in Class I being considerably greater than that for milk in Class II, § 903.4. Each producer receives his pro-rata share of the total or pooled value for both classes of all producers' milk bought during the calendar month by the particular handler to whom he has sold. §§ 903.7, 903.8.

Some handlers in the marketing area, however, over a period of years, have been purchasing milk also from others than producers,[14] as those terms are defined in the order, § 903.1(e) and (f), supra. Mostly, these purchases have been made from Chicago dealers, who are subject to a separate federal milk order applicable to the Chicago marketing area.[15] The health authorities of the city of St. Louis have approved this Chicago milk for consumption in the St. Louis area. The record shows

---

than producers or handlers which was disposed of as fluid milk outside the marketing area;

(3) Subtract from the remaining pounds of milk in Class II (other than milk used for evaporated milk in hermetically sealed containers) an amount so utilized but not to exceed 5 percent of the total receipts of milk from producers: Provided, That a smaller percentage shall be applied under this subparagraph if designated by the handler on his report made pursuant to § 903.-5(a) (1).

(4) Subtract from the remaining pounds of milk in each class, in series beginning with the lower-priced Class II use, the pounds of milk, skim milk, and cream received from sources other than producers or other handlers; and

(5) Add to the net figure for Class II milk computed under (4) of this paragraph, the amount subtracted under (3) of this paragraph."

The controversy here relates to provisions (3), (4) and (5) only.

[12] Here, the health authorities of the city of St. Louis, Missouri.

[13] The technical factors and differentials entering into the class minimum prices under the order are not here material.

[14] Three of the 22 petitioning handlers had been purchasing such outside milk, and from time to time they had sold part of it to some of the other handlers. The other handlers might themselves undertake to make importations at any time.

[15] 7 C.F.R. Cum.Supp., § 941.0 et seq., 7 C.F.R. 1944 Supp., §§ 941.4, 941.5.

that there are times when the supply from producers in the St. Louis area has been less than the total utilization by handlers of Class I and Class II milk. On a brief occasion in 1942 and also in 1943, the supply of producers' milk was not quite sufficient even for the Class I utilization. Prior to the amendment of Order No. 3 on December 27, 1943, the milk imported from the Chicago area was allowed to be prorated with the producers' milk from the St. Louis area as to both Class I and Class II utilizations.[16]

From the administrative findings, it appears that in 1943 the St. Louis producers had complained that the pooling of outside milk with their milk for the higher-priced Class I utilization was a deteriorating factor in the market and would tend in the long run to decrease local production, and that they had urged that a better market would be promoted by encouraging the use of local milk as fully as possible for fluid purposes (Class I) and the use of any outside milk for milk products (Class II). The allocation formula was an attempt to deal with the problem thus presented. It was adopted only after a full hearing to both handlers and producers and on a determination that it was "the only practical means * * * of advancing the interests of producers * * * in the St. Louis, Missouri, marketing area." § 903.0(b) (2).

The effect of provisions (3), (4) and (5) of § 903.3(e),[17] which is the formula in question, is to require a handler, who also purchases outside milk, to allocate to local producers' milk, for price-payment purposes,

95 per cent of his Class I utilization, if he has received producers' milk in that amount or greater, and, if not, then to the full extent of such milk received. In other words, in computing the minimum price to be paid producers, a handler is required to treat producers' milk as being entitled to payment on the basis of up to 95 per cent of his Class I utilization, before his use of outside milk can be taken into account as a factor affecting the market price of producers' milk. To illustrate with the example used in the administrative findings, "if a handler receives 100 pounds of milk from producers and 100 pounds from a Chicago dealer and uses 150 pounds as Class I and 50 pounds as Class II, at least 95 pounds of local producers' milk shall be considered as used for Class I purposes." Prior to the amended order, on the figures of the illustration, local producers would have been paid for only 75 pounds of Class I utilization.[18]

The handlers contend here, as we have indicated, that these provisions of the allocation formula are not authorized by 7 U.S. C.A. § 608c (5), which directs that milk under marketing orders shall be classified "in accordance with the form in which or the purpose for which it is used" and provides that such orders shall contain only such "terms and conditions" as the statute authorizes and "no others." They urge that the allocation formula classifies milk on the basis of its source instead of its use,[19] and so violates the statute. But the word "source" is here hardly more than a beguiling term for conjuring a legal artificiality into the distinction which inherently exists

---

[16] Prior to the amendment of December 27, 1943, Order No. 3 had contained the following provision (7 C.F.R. Cum. Supp., § 903.3(d) ):

"Milk approved by the proper health authorities for consumption in fluid form in the marketing area which has been received from a person who is a handler, as defined under another Federal marketing agreement or order, shall be deducted from each class in the proportion that the quantity used in each class by the receiving handler bears to the total quantity of milk received by him, after excluding such handler's receipts of milk from other handlers."

[17] For the exact language of these provisions, see footnote 11, supra.

[18] Actually, according to the evidence in the record, the quantity of milk used by importing handlers in Class II was approximately 20 per cent of that used by them in Class I.

[19] The record shows that in practice and as a matter of economic operation a handler commingles his producers' and his approved outside milk, so that there is no way of establishing the actual use of any particular milk. The Secretary of Agriculture concedes, however, that the application of the formula is not controlled by the commingling, and that the formula would be operative even if the outside milk were kept separate and directly used as Class I milk.

between producers' and non-producers' milk under the regulative purposes of the Act.

It is to be borne in mind that the classification requirement in 7 U.S.C.A. § 608c (5) (A) has reference to producers' milk, so that the question under this provision is merely whether the allocation formula compels a handler to pay for producers' milk on other than a form-of-use or purpose-of-use classification basis. Two classes of use, Class I and Class II,[20] have properly been established by the order for classification purposes. § 903.3(b). The order does not compel a handler to pay producers for any greater utilization of milk than he makes in the particular class. The allocation formula therefore does not reach outside the established classes or beyond the handler's utilization in them. The operative effect of the formula has heretofore been explained. Its technical aspect in the order is simply that of a device for arriving at the classification of producers' milk, where the situation is complicated by the factor of the handler's use of outside milk. Under the admitted practice of a handler of commingling all his approved milk, some method of allocation for classification purposes would in any event be necessary on his part.

The handlers insist that proration is the only proper and just method of allocation, but they, of course, are looking at their own position as much as that of producers, while the statute looks primarily at that of producers. There can be no doubt that proration is a permissible method, where it is determined to be an adequate means of dealing with such a market situation in the light of the producers' interests. But it cannot be said that it is the only permissible method, where the Secretary of Agriculture has concluded that it does not sufficiently solve the effect on producers' prices of a fluid use of outside milk and where that conclusion cannot be held to be without a rational basis as a matter of administrative judgment.

In a mechanical sense, the formula here adopts as its basis of classification for producers' milk the handler's available uses as of the time the milk is received. It treats such milk as being entitled for price purposes to the position of the handler's highest-class use (up to the extent of 95 per cent), which is the use to which it naturally would be applied except for the handler's purchase of outside milk. The District Court expressed its view thus: "Here the Secretary takes the uses available, in the case of the importing handler, prior to the mixing of the producers' milk and imported milk, as the yardstick or formula for fixing classification of the milk." 61 F.Supp. at page 220. Or, as we have previously put it, a handler, for the purpose of computing the amount of the uniform price to be paid producers, is required to treat producers' milk as entitled to payment on the basis of up to 95 per cent of his Class I utilization, before his use of outside milk can be taken into account as a factor affecting the market price of producers' milk.

We think such an allocation to available use is an authorized use-of-milk classification for price-formula purposes under the statute. It is the handler's actual utilization of milk that controls the operation of the formula. The term "use" or "used" in 7 U.S.C.A. § 608c(5) (A) is not required to be read as one of literalness or consumptive ultimacy, but it is entitled to be given a practical regulatory significance in relation to handlers' processes and the effect of their mode of doing business upon the market problem. Previous decisions have so recognized. Thus, in Queensboro Farms Products, Inc., v. Wickard, 2 Cir., 137 F.2d 969, it was held (one judge dissenting) that a classification of producers' milk on the basis of the form in which it was moved from a handler's plant was a valid use classification for price-formula purposes, no matter what might be its actual ultimate utilization. Again, in Waddington Milk Co. v. Wickard, 2 Cir., 140 F.2d 97, 101, the court declared: "Given the conditions and the purpose, there appears to be nothing

---

20 In some marketing areas, the utilization by handlers has been broken down into more than two classes by the applicable milk order. Thus, the order involved in Waddington Milk Co. v. Wickard, 2 Cir., 140 F.2d 97, established 9 classes of utilization.

unreasonable in selecting as the controlling point for determination of the form in which milk is to be classified for the fixing of wholesale prices the time when it leaves the initial receiving plant of the distributor." The Supreme Court has refused to read other language in 7 U.S.C.A. § 608c(5) (A) in a literal significance which would defeat the regulatory purpose of the Act, when it held in United States v. Rock Royal Co-operative, 307 U.S. 533, 578-580, 59 S.Ct. 993, 1016, 83 L.Ed. 1446, that an "agency" cooperative was subject to the Agricultural Marketing Agreement Act, even though it had not technically "purchased" the milk of its producers, because "As here used the word 'purchased' means 'acquired for marketing.'" It also would seem to be entitled to note at least, in considering whether the allocation formula here is violative of the statute, that at the time the Agricultural Marketing Agreement Act was enacted there were outstanding under the Agricultural Adjustment Act, 48 Stat. 31, 49 Stat. 750, which the Agricultural Marketing Agreement Act re-enacted and of which 7 U.S.C.A. § 608c(5) was a part, several milk orders containing allocation provisions indistinguishable in principle from the present formula,[21] and that in section 4 of the Agricultural Marketing Agreement Act, 50 Stat. 249, 7 U.S.C.A. § 672, Congress saw fit to declare that all outstanding orders "are hereby expressly ratified * * *." And, finally, in hospitable approach to the question of statutory construction, it should be observed that if allocation of highest-class utilization to producers' milk as against outside milk is not permissible as a use classification for price purposes under 7 U.S.C.A. § 608c(5) (A) then a handler could by segregation and use of his outside milk in Class I completely frustrate the regulatory purpose of the statute.

The allocation for price-determination purposes made by the formula cannot be said to be a legal command to a handler to use his milk in a particular manner, as the handlers contend. He is as free in law to make such actual use of any part of his milk for a particular purpose as he was before. Nor does the formula violate the provision in 7 U.S.C.A. § 608c(5) (A) that minimum class prices shall be uniform as to all handlers. The minimum class prices per hundred weight are untouched by the formula. The total amount distributable by an importing handler to his producers will be greater than before, but this is only because he is required to pay producers on the basis of more of his Class I utilization. The fact that the uniform price to producers from an importing handler may, because of the increased Class

---

[21] Where the "producer milk" consisted of milk acquired from producers other than the handler himself and the "outside milk" consisted of the handler's own production, all the handler's milk was classified according to use and the class utilization was then allocated to "producer milk" by excluding not exceeding 95 per cent of the outside milk from Class I utilization (Fall River, Mass., Order No. 5, Art. VI, § 1, 1 F.R. 202) or from Class I and Class II utilization (Kansas City, Mo., Order No. 13, Art. VI, § 2, 1 F.R. 1724) and the balance from lower class utilization.

Allocation provisions similar in principle are also included in other milk orders. Thus, the highest class uses have been allocated to producers' milk in the following instances by assigning first to low class uses the outside milk consisting of (1) emergency milk (Dayton-Springfield, Ohio, Order No. 71, § 971.4 (e) (10) (ii), 10 F.R. 6165); (2) emergency milk, except that such milk disposed of to the armed forces a stated distance outside the area may within certain limits receive higher classification (Washington, D.C., Order No. 45, § 945.6 (f), 10 F.R. 13585); (3) milk received from sources other than producers, own farm production, emergency milk and milk from other handlers (Columbus, Ohio, Order No. 74, § 974.4 (f) (2), 10 F.R. 1085; Dayton-Springfield, Ohio, Order No. 71, § 971.4 (e) (10) (i), 10 F.R. 6164; Minneapolis-St. Paul, Minn., Order No. 73, § 973.4 (e) (4) (i), 10 F.R. 13435; Tri-State Order No. 72, § 972.4 (e) (9) (i), 10 F.R. 8645). There are other instances also of equivalent allocation provisions, which we shall not enumerate, as the foregoing are sufficient to illustrate the reality of the problem which the Secretary faces from outside milk in attempting to achieve such prices as Congress intended should exist in a market for local producers' milk.

I allocation under the formula, be slightly greater than the uniform price to producers from some non-importing handler having a less volume of Class I milk-use, is not legally distinguishable from the differences which have theretofore existed and will continue to exist in the uniform prices paid to producers by the separate handlers because of the variation in the volume and proportion of their Class I and Class II utilizations. Such differences among handlers in the uniform price payable to producers are inherent and clearly contemplated by the statute in any market of individual-handler pools.

It is further contended that the allocation formula penalizes the utilization or handling of milk from other production areas and thereby violates 7 U.S.C.A. § 608c (5) (G) and also Art. 1, § 8, cl. 1, and Art. 1, § 9, cl. 6 of the Constitution, as well as the Fifth Amendment.

■■■ 7 U.S.C.A. § 608c (5) (G) provides that "No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States." From the language of the provision and its legislative history,[22] the term "prohibit" has application to both milk and milk products, but the term "in any manner limit" has application only to milk products. The amended order does not prohibit the marketing of imported milk in the St. Louis market. If there is any discouragement to the importation of outside milk, it is primarily in the price which the importing handlers may have to pay to obtain it, and that is in no way regulated by the amended order. The handlers argue, however, that the effect of the order will be to make it impossible for them to buy milk in the Chicago market, because under the Chicago marketing order[23] Chicago handlers prior to January 1, 1944, were required to pay Chicago producers for milk which they sold to handlers under other federal milk orders an amount equal to the prorated value of such milk with local producers' milk in the importing market, and since January 1, 1944, they have been required under the Chicago order to pay producers for such milk the Class I price of the Chicago market, and that the Chicago handlers therefore will not be willing to sell milk to St. Louis handlers on the basis of St. Louis Class II prices. That may be true practicably, but in the interplay of the two orders there is nothing legally that prohibits a Chicago dealer from selling, or a St. Louis handler from purchasing, this surplus milk at any price, no matter on what basis Chicago producers may have had to be paid in order to get a sufficient supply of milk generally into the Chicago market.

■■■ We do not see how Art. I, § 8, cl. 1, of the Constitution, providing that "all Duties, Imposts and Excises shall be uniform throughout the United States," can have any possible application here, for clearly no duties, imposts or excises are involved. Nor can there be said to be any violation of Art. I, § 9, cl. 6, providing that "No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another." Viewing St. Louis as a port for purposes of the contention, no preference for the entry of milk into that city is given as against the entry of milk into the city of Chicago. But in any event, under this constitutional provision, "what is forbidden is, not discrimination between individual ports within the same or different States, but discrimination between States." State of Pennsylvania v. Wheeling & Belmont Bridge Co., 18 How. 421, 435, 59 U.S. 421, 435, 15 L.Ed. 435.

■■■ The argument that the allocation formula is so arbitrary and capricious as to constitute a violation of due process under the Fifth Amendment would also seem to be without merit. The formula bears a direct and we think reasonable relation to the accomplishment of a valid legislative purpose—the improvement of market prices for producers' milk. Insofar as discrimination may be relied upon

---

[22] See H. Rept. No. 1757, 74th Cong., 1st session, p. 21.

[23] See footnote 15, supra.

as an element of arbitrariness for due-process purposes, there is here no discrimination in a legal sense between handlers, for the formula treats all in the same class alike. The importation of needed milk is not prohibited. Handlers have the same legal right to import milk and use it in their business as they always have had. They are left as free as before to negotiate for prices upon the surplus Chicago milk. If the formula or its contemporaneous operation with the Chicago order affects their ability to obtain and handle such milk profitably, that result is an incidental or collateral one, to which the accomplishment of the superior regulatory purpose is not required to yield.

■ Absent a violation of due process, there is no aid to the argument here in the use of such phrases as "protective tariff" or "trade barrier." If the amended order, legislatively authorized as we have held, has the effect of limiting commerce in milk between Chicago and St. Louis, there is in that fact no constitutional repugnance, for, consistent only with due process, the Constitution does not prevent the limiting (Mulford v. Smith, 307 U.S. 38, 48, 59 S.Ct. 648, 83 L.Ed. 1092) or the prohibiting (United States v. Carolene Products Co., 304 U.S. 144, 58 S. Ct. 778, 82 L.Ed. 1234) of any part of interstate commerce, and this without regard to uniformity. Currin v. Wallace, 306 U.S. 1, 14, 59 S.Ct. 379, 83 L.Ed. 441.

There is a final contention by the handlers that relevant evidence was refused admission on the administrative hearing. The evidence in question was excluded by the presiding officer at the time of the hearing as irrelevant, but it was incorporated in the record and the administrative findings convince us that it was taken into account and its effect sufficiently considered on the final ruling.

We are not able to declare that Order No. 3, as amended, is "not in accordance with law" (7 U.S.C.A. § 608c (15) (B), and the judgment is accordingly affirmed.[24]

24 The judgment also contained an injunction, entered on a counterclaim by the Secretary, requiring certain of the petitioning handlers who had not complied with the amended order to do so.