**PACIFIC REFINING CO., and Coastal States Gas Corp., Plaintiffs,**

v.

**DEPARTMENT OF ENERGY and James R. Schlesinger, Defendants.**

Civ. A. No. 78–60.

United States District Court, D. Delaware.

Aug. 16, 1978.

William O. LaMotte, III, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiffs; Keith A. Jones and Mary Carolyn Cox, Fulbright & Jaworski, Washington, D. C., of counsel.

John X. Denney, Jr., Asst. U. S. Atty., Dept. of Justice, Wilmington, Del., Barbara Allen Babcock, Dennis G. Linder, and Elizabeth Langer, Dept. of Justice, Robert G. Heiss, and C. Lee Allen, Dept. of Energy, Washington, D. C., for defendants.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This case presents the issue whether a substantial question exists under one of the more obscure provisions of the Constitution, art. I, § 9, cl. 6, the Port Preference Clause. If so, this Court should certify the question for decision by the Temporary Emergency Court of Appeals ("TECA") before resolving the remaining issues in the case. Economic Stabilization Act of 1970, § 211(c), 84

Stat. 799, *as amended*, 12 U.S.C.A. § 1904 n. (Supp.1978).

### I. Background

Plaintiffs have filed suit challenging a final rule adopted by the Department of Energy ("DOE") on December 14, 1977 amending 10 C.F.R. Parts 211 and 212. 42 Fed.Reg. 62897 (1977). The rule relates to the allocation of crude oil. Thorough briefs were received and oral argument was heard on July 21, 1978.

In August 1973, the Cost of Living Council, assigned the task of devising a system of price controls for the petroleum industry, fixed maximum lawful prices that producers could charge for most domestic crude oil ("old oil"). Shortly thereafter, the price of foreign crude oil and uncontrolled domestic crude oil ("new oil") increased. Subsequently, the Federal Energy Administration[1] ("FEA") enacted the "Entitlements Program"[2] "to achieve the equitaole distribution of the low priced old oil among all sectors of the petroleum industry . . . and thereby to assure that domestically refined petroleum products are sold at equitable prices by all distributors of petroleum products . . . in all regions of the United States." 36 Fed.Reg. 31650 (1974).

In essence, the Entitlements Program is a cost equalization mechanism intended to allocate low cost old oil on a proportionate basis. An "entitlement" represents the right to refine one barrel of old oil each month. Each refiner is allocated a monthly number of entitlements consisting of the number of barrels of crude oil it refines multiplied by the percentage of old oil in the national crude oil supply. To be able to refine all their oil in a given month, refiners with a higher than average amount of old oil must purchase entitlements from refiners having an excess of entitlements because they owned less than the average amount of old oil. Theoretically, the trans-

---

1. On October 1, 1977, the Department of Energy ("DOE") succeeded to the interests of the Federal Energy Administration ("FEA"). *See* 42 U.S.C. §§ 7131, 7251 n. (Supp.1978); Doc. 14, at 1 n. 1.

2. 10 C.F.R. § 211.67.

fer of funds should equalize the net cost of crude oil to the refiners.[3]

The December 14, 1977 DOE final rule[4] amended the entitlements program, making it less expensive to acquire entitlements for California low grade old oil. The DOE contends this action was taken because refiners were paying less than the ceiling price for the old oil and many refiners were unwilling to process it due to its poor quality.[5]

Plaintiffs contend the final rule imposes an entitlements penalty upon the receipt of imported crude oil in California.[6] Noting that the final rule prospectively was abandoned five months after its adoption,[7] plaintiffs aver they were substantially and adversely affected by its operation.

## II. *The Port Preference Clause*

Article one, section nine, clause six of the Constitution states: "No preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State, be obliged to enter, clear, or pay Duties in another."

Plaintiffs aver that the guiding principle of this provision is that "the federal government may not favor or discriminate against a particular state or states with respect to importation, exportation, or other significant aspects of foreign trade"[8] and that the DOE final rule has "the direct and intended effect of placing a significant monetary penalty upon the receipt of foreign crude oil in California that is not placed upon the receipt of such crude oil in other states."[9]

In contrast, the Government argues that the Port Preference Clause is inapplicable because plaintiffs cannot show discrimination between all ports in the State of California and all ports elsewhere and any penalty suffered by plaintiffs is incidental to the purpose of the final rule.

### A. *Case Law*

Few reported cases have involved the Port Preference Clause. Plaintiffs acknowledge they have located only one case invalidating an act under the clause and

---

**3.** The TECA has recently more precisely defined the program as follows:

> The Entitlements Program requires refiners who run a greater percentage of lower tier price controlled crude than the national average to purchase entitlements from those refiners who run a smaller percentage than the national average, thereby equalizing the cost of crude oil for all refiners. Entitlements obligations are determined monthly on the basis of the national old oil ratio (the national average of lower tier crude processed or run by refiners), the lower tier equivalent of upper tier uncontrolled crude, and the value of one entitlement (the difference between the weighted average cost to refiners of lower tier crude and the weighted average cost of upper tier uncontrolled crudes less an offset for a per barrel import fee).

*Husky Oil Co. v. Dept. of Energy*, No. 10–18 (TECA Aug. 10, 1978), slip. op. at 2 (footnotes omitted).

**4.** The text of the rule provides:

> For each month, commencing with the month of January 1978, the number of entitlements issued under paragraph (a)(1) of this section to each refiner shall (i) be increased by the number of barrels of California lower tier crude oil included in its adjusted crude oil receipts in that month multiplied by a fraction equal to $1.74 divided by the entitlement price for that month; and (ii) be decreased by a number of entitlements equal to (A) the number of barrels of imported crude oil and Alaska North Slope crude oil that are included in its adjusted crude oil receipts in that month with respect to its refineries located in the State of California multiplied by (B) the aggregate increase in entitlement issuances for all refiners calculated pursuant to paragraph (a)(4)(i) above, divided by the total number of barrels of imported crude oil and Alaska North Slope crude oil included in the adjusted crude oil receipts for that month for all refiners with respect to refineries located in the State of California.

42 Fed.Reg. 62902 (1977) (amending 10 C.F.R. § 211.67(a)(4)).

**5.** Doc. 14, at 7.

**6.** Doc. 10, at 3.

**7.** Doc. 17, at 17 (Transcript of oral argument of July 21, 1978).

**8.** Doc. 10, at 7.

**9.** *Id.* 8.

that case obviously was wrongly decided.[10] For guidance in this matter, two cases are meaningful. First is the very old but still leading case on point, *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855).

*Wheeling & Belmont Bridge* involved a dispute between the states of Virginia and Pennsylvania. A bridge was to be constructed over the Ohio River at a height that would preclude the tallest class of sailing ships from travelling under it. Pennsylvania urged that construction be enjoined because the bridge would give a preference to ports of Virginia over those of Pennsylvania. The Court rejected the argument, holding that the Port Preference Clause forbids "not discrimination between individual ports within the same or different States, but discrimination between States; and if so, in order to bring the case within the prohibition, it is necessary to show, not merely discrimination between Pittsburg and Wheeling, but discrimination between the ports of Virginia and those of Pennsylvania." 59 U.S. at 435. The Court further found that an act of Congress conferred full authority to construct the bridge.

The other precedent of particular relevance is *Consumers Power Co. v. FEA*, 3 En. Mngm't (CCH) ¶ 26,078 (D.D.C.1977). That recent case, highly analogous to the matter *sub judice*, contained a challenge to FEA regulations issued in response to petroleum market dislocations. Certain importers located in the Midwest challenged the regulations on the grounds they were excluded from intangible property rights to "entitlements" because of their geographical location. The district court gave short shrift to the contention that a substantial constitutional question arose under the Port Preference Clause, first noting that the clause was "a vestige of an age in which rivalry among the states was a significant threat to the new federal system," 3 En. Mngm't (CCH) ¶ 26,078 at 26,613, and then concluding the clause "reaches only situations in which the ports of one state are directly preferred over those of another state, and not where the preference is only incidental or an accident of geography." *Id. Consumers Power* held that plaintiffs' claim under the Port Preference Clause was insubstantial because the FEA regulation in question had at most the incidental effect and not the purpose of favoring the ports of one state over those of another.

### B. *Analysis*

▇▇▇ For various reasons, it is concluded the Port Preference Clause does not pose a substantial [11] constitutional question in this case. The primary basis for this holding is that plaintiffs have failed to show discrimination among ports. The Court accepts the distinction drawn by the Government that ports are points of entry and that refineries, and certainly inland refineries, do not so qualify. Although it is conceded a port may be a road, railroad, or airport,[12] that is so because the three are means of entry into commerce.

Plaintiffs argue this construction is "crabbed" and "elevates form over substance."[13] But to take a provision originally enacted out of specific and understandable fears[14] and transpose it after over a century of disuse to apply to the present circumstances would be gross abuse of judi-

---

10. Doc. 17, at 16.

11. *See Cities Service Co. v. FEA*, 529 F.2d 1016, 1019–20 n. 4 (TECA 1975) (quoting the lower court opinion reported at 3 En. Mngm't (CCH) ¶ 26,024 at 26,224), *cert. denied*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976):

    " '[Constitutional] questions are not substantial if they are plainly without merit or if previous Supreme Court decisions appear to foreclose the subject.' "

12. Doc. 14, at 11 n. 9.

13. Doc. 16, at 4.

14. *E. g., Wheeling & Belmont Bridge, supra*, 59 U.S. at 434: "It appears also, from the reports of the convention, that several of the delegates from . . . [Maryland] . . . expressed apprehensions that under the power to regulate commerce congress might favor ports of particular States, by requiring vessels destined to other States to enter and clear at the ports of the favored ones, as a vessel bound for Baltimore to enter and clear at Norfolk."

cial authority. Either the instant situation is covered by other more broad constitutional provisions [15] or plaintiffs should appeal to Congress to enact legislation to remove any inequity. Far from going "to the core of the Port Preference Clause," [16] plaintiffs' argument ascribes a new meaning to the provision.

In addition, plaintiffs have failed adequately to distinguish *Consumers Power*. Apart from declaring that the case was wrongly decided,[17] plaintiffs offer two differences between that case and the one at bar.[18] The first variation, that *Consumers Power* dealt with an area of the country and not a particular state, plaintiffs concede is not "of constitutional significance in the Port Preference Clause." [19] The second attempted distinction is a narrow factual argument going to whether the fuel oil in *Consumers Power* was alleged to have moved outside the affected region as compared to plaintiffs' allegation that the penalized oil in this case remains in California. Noting that the latter assertion is a disputed issue of fact, the Court is convinced that application of the Port Preference Clause cannot turn on such a precarious fulcrum.

Finally, the Court deems it significant that it is conceded the final rule at issue is not alleged to discriminate against all ports in California but only those using certain types of oil.[20] Moreover, some California refiners clearly were benefitted by the rule.[21] In this regard the interpretation of the Port Preference Clause contained in *Bailey Farm Dairy Co. v. Anderson*, 157 F.2d 87, 96 (8th Cir. 1946), is instructive:

> Viewing St. Louis as a port for purposes of the contention, no preference for the entry of milk into that city is given as against the entry of milk into the city of Chicago. But in any event, under this

constitutional provision, 'what is forbidden is, not discrimination between individual ports within the same or different States, but discrimination between States.' *State of Pennsylvania v. Wheeling & Belmont Bridge Co.*, 18 How. 421, 435, 59 U.S. 421, 435, 15 L.Ed. 435.

### C. *Conclusion*

 In sum, plaintiffs' asserted substantial constitutional question is plainly without merit and largely foreclosed by the Supreme Court decision in *Wheeling & Belmont Bridge* upon which the district court in *Consumers Power* relied. Plaintiffs' motion for certification of a constitutional question to TECA will be denied.

---

**15.** Defendants suggest that plaintiffs' argument more properly would be brought under the Equal Protection Clause of the Fifth Amendment and that it would fail because defendants can show a rational basis for the DOE final rule. Doc. 17, at 38.

**16.** Doc. 16, at 5.

**17.** Doc. 17, at 52.

**18.** *Id.*

**19.** *Id.*

**20.** Doc. 17, at 9.

**21.** *Id.* 41. California refiners processing the low grade oil profited from the lower price of entitlements for the old oil.