## H. P. HOOD & SONS, INC. *v.* Du MOND, COMMIS-
## SIONER OF AGRICULTURE AND MARKETS.

No. 92. Argued December 13–14, 1948.—Decided April 4, 1949.

*Warren F. Farr* argued the cause and filed a brief for petitioner.

*Nathaniel L. Goldstein,* Attorney General of New York, and *Robert G. Blabey* submitted on brief for respondent.

MR. JUSTICE JACKSON delivered the opinion of the Court.

This case concerns the power of the State of New York to deny additional facilities to acquire and ship milk in interstate commerce where the grounds of denial are that such limitation upon interstate business will protect and advance local economic interests.

H. P. Hood & Sons, Inc., a Massachusetts corporation, has long distributed milk and its products to inhabitants of Boston. That city obtains about 90% of its fluid milk from states other than Massachusetts. Dairies located in New York State since about 1900 have been among the sources of Boston's supply, their contribution having varied but during the last ten years approximating 8%. The area in which Hood has been denied an additional license to make interstate purchases has been developed as a part of the Boston milkshed from which both the Hood Company and a competitor have shipped to Boston.

The state courts have held and it is conceded here that Hood's entire business in New York, present and proposed, is interstate commerce. This Hood has conducted for some time by means of three receiving depots, where it takes raw milk from farmers. The milk is not processed in New York but is weighed, tested and, if necessary, cooled and on the same day shipped as fluid milk to Boston. These existing plants have been operated under license from the State and are not in question here as the State has licensed Hood to continue them. The controversy concerns a proposed additional plant for the same kind of operation at Greenwich, New York.[1]

---

[1] The New York Court of Appeals described the geographical situation with respect to petitioner's present and proposed plants

Article 21 of the Agriculture and Markets Law of New York [2] forbids a dealer to buy milk from producers unless licensed to do so by the Commissioner of Agriculture and Markets. For the license he must pay a substantial fee and furnish a bond to assure prompt payment to producers for milk. Under § 258, the Commissioner may not grant a license unless satisfied "that the applicant is qualified by character, experience, financial responsibility and equipment to properly conduct the proposed business." [3] The Hood Company concededly has met all the foregoing tests and license for an additional plant was not denied for any failure to comply with these requirements.

as follows: "The extension would have permitted petitioner to operate a milk receiving plant at Greenwich, New York, in addition to petitioner's other similar plants already licensed and operating at Eagle Bridge, Salem and Norfolk, in this State. Eagle Bridge is in Rensselaer County and Salem and Greenwich are in Washington County, Rensselaer County being adjacent to Washington County on the south, and both these counties being on the easterly edge of New York State, bordering on Massachusetts and Vermont. Petitioner's Norfolk establishment is in St. Lawrence County in another part of New York State, and serves a different area and a different group of milk producers. The present Eagle Bridge and Salem depots, however, are quite close together and the proposed Greenwich plant, for which a license has been refused, is ten miles from Salem and twelve miles from Eagle Bridge." 297 N. Y. 209, 212; 78 N. E. 2d 476, 477.

[2] Laws of 1934, c. 126.

[3] Section 258-c provides in pertinent part as follows:

"No license shall be granted to a person not now engaged in business as a milk dealer except for the continuation of a now existing business, and no license shall be granted to authorize the extension of an existing business by the operation of an additional plant or other new or additional facility, unless the commissioner is satisfied that the applicant is qualified by character, experience, financial responsibility and equipment to properly conduct the proposed business, that the issuance of the license will not tend to a destructive competition in a market already adequately served, and that the issuance of the license is in the public interest. . . ."

528

The Commissioner's denial was based on further provisions of this section which require him to be satisfied "that the issuance of the license will not tend to a destructive competition in a market already adequately served, and that the issuance of the license is in the public interest."

Upon the hearing pursuant to the statute, milk dealers competing with Hood as buyers in the area opposed licensing the proposed Greenwich plant. They complained that Hood, by reason of conditions under which it sold in Boston, had competitive advantages under applicable federal milk orders, Boston health regulations, and OPA ceiling prices. There was also evidence of a temporary shortage of supply in the Troy, New York market during the fall and winter of 1945–46. The Commissioner was urged not to allow Hood to compete for additional supplies of milk or to take on producers then delivering to other dealers.

The Commissioner found that Hood, if licensed at Greenwich, would permit its present suppliers, at their option, to deliver at the new plant rather than the old ones and for a substantial number this would mean shorter hauls and savings in delivery costs. The new plant also would attract twenty to thirty producers, some of whose milk Hood anticipates will or may be diverted from other buyers. Other large milk distributors have plants within the general area and dealers serving Troy obtain milk in the locality. He found that Troy was inadequately supplied during the preceding short season.

In denying the application for expanded facilities, the Commissioner states his grounds as follows:

"If applicant is permitted to equip and operate another milk plant in this territory, and to take on producers now delivering to plants other than those which it operates, it will tend to reduce the volume of milk received at the plants which lose those pro-

ducers, and will tend to increase the cost of handling milk in those plants.

"If applicant takes producers now delivering milk to local markets such as Troy, it will have a tendency to deprive such markets of a supply needed during the short season.

"There is no evidence that any producer is without a market for his milk. There is no evidence that any producers not now delivering milk to applicant would receive any higher price, were they to deliver their milk to applicant's proposed plant.

"The issuance of a license to applicant which would permit it to operate an additional plant, would tend to a destructive competition in a market already adequately served, and would not be in the public interest." [4]

Denial of the license was sustained by the Court of Appeals [5] over constitutional objections duly urged under the Commerce Clause [6] and, because of the importance of the questions involved, we brought the case here by certiorari. [7]

Production and distribution of milk are so intimately related to public health and welfare that the need for regulation to protect those interests has long been recognized and is, from a constitutional standpoint, hardly controversial. Also, the economy of the industry is so eccentric that economic controls have been found at once necessary and difficult. These have evolved detailed, intricate and comprehensive regulations, including price-fixing. They have been much litigated but were generally sustained by this Court as within the powers of

---

[4] This finding follows the statutory language. See Note 3.

[5] 297 N. Y. 209, 78 N. E. 2d 476.

[6] U. S. Const., Art. I, § 8, cl. 3, granting Congress power "To regulate Commerce . . . among the several States . . . ."

[7] 335 U. S. 808.

the State over its internal commerce as against the claim that they violated the Fourteenth Amendment.[8] *Nebbia* v. *New York,* 291 U. S. 502; *Hegeman Farms Corp.* v. *Baldwin,* 293 U. S. 163; *Borden's Co.* v. *Ten Eyck,* 297 U. S. 251. But see *Mayflower Farms* v. *Ten Eyck,* 297 U. S. 266. As the states extended their efforts to control various phases of export and import also, questions were raised as to limitations on state power under the Commerce Clause of the Constitution.

Pennsylvania enacted a law including provisions to protect producers which were very similar to those of this New York Act. A concern which operated a receiving plant in Pennsylvania from which it shipped milk to the New York City market challenged the Act upon grounds thus defined by this Court: "The respondent contends that the act, if construed to require it to obtain a license, to file a bond for the protection of producers, and to pay the farmers the prices prescribed by the Board, unconstitutionally regulates and burdens interstate commerce." *Milk Board* v. *Eisenberg Co.,* 306 U. S. 346, 350. This Court, specifically limiting its judgment to the Act's provisions with respect to license, bond and regulation of prices to be paid to producers, *id.* at 352, considered their effect on interstate commerce "incidental and not forbidden by the Constitution, in the absence of regulation by Congress." *Id.* at 353.

The present controversy begins where the *Eisenberg* decision left off. New York's regulations, designed to assure producers a fair price and a responsible purchaser, and consumers a sanitary and modernly equipped handler, are not challenged here but have been complied with. It is only additional restrictions, imposed for the avowed purpose and with the practical effect of curtailing

---

[8] ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

the volume of interstate commerce to aid local economic interests, that are in question here, and no such measures were attempted or such ends sought to be served in the Act before the Court in the *Eisenberg* case.[9]

Our decision in a milk litigation most relevant to the present controversy deals with the converse of the present situation. *Baldwin* v. *Seelig*, 294 U. S. 511. In that case, New York placed conditions and limitations on the local sale of milk imported from Vermont designed in practical effect to exclude it, while here its order proposes to limit the local facilities for purchase of additional milk so as to withhold milk from export. The State agreed then, as now, that the Commerce Clause prohibits it from directly curtailing movement of milk into or out of the State. But in the earlier case, it contended that the same result could be accomplished by controlling delivery, bottling and sale after arrival, while here it says it can do so by curtailing facilities for its purchase and receipt before it is shipped out. In neither case is the measure supported by health or safety considerations but solely by protection of local economic interests, such as supply for local consumption and limitation of competition. This Court unanimously rejected the State's contention in the *Seelig* case and held that the Commerce Clause, even in the absence of congressional action, prohibits such regulations for such ends.

The opinion was by Mr. Justice Cardozo, experienced in the milk problems of New York and favorably disposed toward the efforts of the State to control the industry. *Hegeman Farms Corp.* v. *Baldwin,* 293 U. S. 163; *Borden's Co.* v. *Baldwin,* 293 U. S. 194, concurrence at 213; *Mayflower Farms* v. *Ten Eyck,* 297 U. S. 266, dissent at 274. It recognized, as do we, broad power in the State to pro-

---

[9] The Court said: "The Commonwealth [of Pennsylvania] does not essay to regulate or to restrain the shipment of the respondent's milk into New York . . . ." 306 U. S. 346, 352.

tect its inhabitants against perils to health or safety, fraudulent traders and highway hazards, even by use of measures which bear adversely upon interstate commerce. But it laid repeated emphasis upon the principle that the State may not promote its own economic advantages by curtailment or burdening of interstate commerce.

The Constitution, said Mr. Justice Cardozo for the unanimous Court, "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." [10] He reiterated that the economic objective, as distinguished from any health, safety and fair-dealing purpose of the regulation, was the root of its invalidity. The action of the State would "neutralize the economic consequences of free trade among the states." [11] "Such a power, if exerted, will set a barrier to traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported." [12] "If New York, in order to promote the economic welfare of her farmers, may guard them against competition with the cheaper prices of Vermont, the door has been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation." [13] And again, "Neither the power to tax nor the police power may be used by the state of destination with the aim and effect of establishing an economic barrier against competition with the products of another state or the labor of its residents. Restrictions so contrived are an unreasonable clog upon the mobility of commerce. They set up what is equivalent to a rampart of customs duties designed to neutralize advantages belonging to the

[10] 294 U. S. 511, 523.

[11] *Id.*, 526.

[12] *Id.*, 521.

[13] *Id.*, 522.

place of origin. They are thus hostile in conception as well as burdensome in result." [14]

This distinction between the power of the State to shelter its people from menaces to their health or safety and from fraud, even when those dangers emanate from interstate commerce, and its lack of power to retard, burden or constrict the flow of such commerce for their economic advantage, is one deeply rooted in both our history and our law.

When victory relieved the Colonies from the pressure for solidarity that war had exerted, a drift toward anarchy and commercial warfare between states began. ". . . each State would legislate according to its estimate of its own interests, the importance of its own products, and the local advantages or disadvantages of its position in a political or commercial view." This came "to threaten at once the peace and safety of the Union." Story, *The Constitution,* §§ 259, 260. See Fiske, *The Critical Period of American History,* 144; Warren, *The Making of the Constitution,* 567. The sole purpose for which Virginia initiated the movement which ultimately produced the Constitution was "to take into consideration the trade of the United States; to examine the relative situations and trade of the said States; to consider how far a uniform system in their commercial regulations may be necessary to their common interest and their permanent harmony" and for that purpose the General Assembly of Virginia in January of 1786 named commissioners and proposed their meeting with those from other states. Documents, *Formation of the Union,* H. R. Doc. No. 398, 12 H. Docs., 69th Cong., 1st Sess., p. 38.

The desire of the Forefathers to federalize regulation of foreign and interstate commerce stands in sharp contrast to their jealous preservation of the state's power over its

---

[14] *Id.,* 527.

534

internal affairs. No other federal power was so universally assumed to be necessary, no other state power was so readily relinquished. There was no desire to authorize federal interference with social conditions or legal institutions of the states. Even the Bill of Rights amendments were framed only as a limitation upon the powers of Congress. The states were quite content with their several and diverse controls over most matters but, as Madison has indicated, "want of a general power over Commerce led to an exercise of this power separately, by the States, wch [*sic*] not only proved abortive, but engendered rival, conflicting and angry regulations." 3 Farrand, *Records of the Federal Convention,* 547.

The necessity of centralized regulation of commerce among the states was so obvious and so fully recognized that the few words of the Commerce Clause were little illuminated by debate. But the significance of the clause was not lost and its effect was immediate and salutary. We are told by so responsible an authority as Mr. Jefferson's first appointee to this Court that "there was not a State in the Union, in which there did not, at that time, exist a variety of commercial regulations; concerning which it is too much to suppose, that the whole ground covered by those regulations was immediately assumed by actual legislation, under the authority of the Union. But where was the existing statute on this subject, that a State attempted to execute? or by what State was it ever thought necessary to repeal those statutes? By common consent, those laws dropped lifeless from their statute books, for want of the sustaining power, that had been relinquished to Congress." *Gibbons* v. *Ogden,* 9 Wheat. 1, concurring opinion at 226.

The Commerce Clause is one of the most prolific sources of national power and an equally prolific source of conflict with legislation of the state. While the Constitution vests in Congress the power to regulate commerce among

the states, it does not say what the states may or may not do in the absence of congressional action, nor how to draw the line between what is and what is not commerce among the states. Perhaps even more than by interpretation of its written word, this Court has advanced the solidarity and prosperity of this Nation by the meaning it has given to these great silences of the Constitution.

*Baldwin* v. *Seelig,* 294 U. S. 511, is an explicit, impressive, recent and unanimous condemnation by this Court of economic restraints on interstate commerce for local economic advantage, but it does not stand alone. This Court consistently has rebuffed attempts of states to advance their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state, while generally supporting their right to impose even burdensome regulations in the interest of local health and safety. As most states serve their own interests best by sending their produce to market, the cases in which this Court has been obliged to deal with prohibitions or limitations by states upon exports of articles of commerce are not numerous. However, in a leading case, *Oklahoma* v. *Kansas Natural Gas Co.,* 221 U. S. 229, the Court denied constitutional validity to a statute by which Oklahoma, by regulation of gas companies and pipe lines, sought to restrict the export of natural gas. The Court held that when a state recognizes an article to be a subject of commerce, it cannot prohibit it from being a subject of interstate commerce; that the right to engage in interstate commerce is not the gift of a state, and that a state cannot regulate or restrain it.

Later West Virginia, by act of the Legislature, undertook regulation of pipe-line companies intended to keep within West Virginia all natural gas there produced that might be required for local needs. This Court held that the State could not accord to its own consumers a pre-

ferred right of purchase over consumers in other states and in language applicable to the case before us now said, "Much of the business is interstate and has grown up through a course of years. West Virginia encouraged and sanctioned the development of that part of the business and has profited greatly by it. Her present effort, rightly understood, is to subordinate that part to the local business within her borders. In other words, it is in effect an attempt to regulate the interstate business to the advantage of the local consumers. But this she may not do." *Pennsylvania* v. *West Virginia,* 262 U. S. 553, at 597, 598.

In *Foster Packing Co.* v. *Haydel,* 278 U. S. 1, the Court cited these two cases as authority for the proposition that "A State is without power to prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the State." 278 U. S. 1, 10. The Court also pointed out that "the purpose [of the statute there involved] is not to retain the shrimp for the use of the people of Louisiana; it is to favor the canning of the meat and the manufacture of bran in Louisiana . . . ." *Id.,* at 13. Thus in the *Foster* case, and in the companion case *Johnson* v. *Haydel,* 278 U. S. 16, although the articles sought to be regulated were shrimp and oysters, which under ordinary conditions might not be considered subjects of commerce, the Court invalidated state enactments attempting to promote local interests at the expense of interstate commerce.

In *Parker* v. *Brown,* 317 U. S. 341, California's restrictions on sales of raisins within the State to those who were there processing and packing them were attacked as invalid because approximately 95% of the crop would find its way into interstate commerce after processing and packing. However, the Court said: ". . . no case has

gone so far as to hold that a state could not license or otherwise regulate the sale of articles within the state because the buyer, after processing and packing them, will, in the normal course of business, sell and ship them in interstate commerce. . . . The regulation is thus applied to transactions wholly intrastate before the raisins are ready for shipment in interstate commerce." 317 U. S. 341, at 361. This regulation of sale to local processors was distinguished from those which were held invalid in *Lemke* v. *Farmers Grain Co.*, 258 U. S. 50, and *Shafer* v. *Farmers Grain Co.*, 268 U. S. 189, because the regulation in the earlier cases was "of the business of those who purchased grain within the state for immediate shipment out of it." *Ibid.* In those cases, the regulation was of interstate commerce itself. Another element in the *Parker* case which led the Court to sustain the California regulation was that it was one which the policy of Congress was to aid and encourage, and the Secretary of Agriculture had approved the State program by loans.

The most recent case of this kind, *Toomer* v. *Witsell*, 334 U. S. 385, involved, among other things, a South Carolina requirement that the owners of shrimp boats fishing off its shores dock at a South Carolina port and unload, pack and stamp their catch with a tax stamp before shipping or transporting it to another state. It was considered that the effect of this section of the statute was to divert to South Carolina employment and business which might otherwise go to other states, and the Court pointed out that "the necessary tendency of the statute is to impose an artificial rigidity on the economic pattern of the industry." 334 U. S. 385, 403–404. It was held that the Commerce Clause was violated by such a provision.

This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, including the vital power of erecting

customs barriers against foreign competition, has as its corollary that the states are not separable economic units. As the Court said in *Baldwin* v. *Seelig*, 294 U. S. 541, 527, "what is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation." In so speaking it but followed the principle that the state may not use its admitted powers to protect the health and safety of its people as a basis for suppressing competition. In *Buck* v. *Kuykendall*, 267 U. S. 307, the Court struck down a state act because, in the language of Mr. Justice Brandeis, "Its primary purpose is not regulation with a view to safety or to conservation of the highways, but the prohibition of competition." The same argument here advanced, that limitation of competition would itself contribute to safety and conservation, and therefore indirectly serve an end permissible to the State, was there declared "not sound." 267 U. S. 307, 315. It is no better here. This Court has not only recognized this disability of the state to isolate its own economy as a basis for striking down parochial legislative policies designed to do so, but it has recognized the incapacity of the state to protect its own inhabitants from competition as a reason for sustaining particular exercises of the commerce power of Congress to reach matters in which states were so disabled. *Cf. Steward Machine Co.* v. *Davis,* 301 U. S. 548; *Carmichael* v. *Southern Coal Co.,* 301 U. S. 495; *Helvering* v. *Davis,* 301 U. S. 619.

The material success that has come to inhabitants of the states which make up this federal free trade unit has been the most impressive in the history of commerce, but the established interdependence of the states only emphasizes the necessity of protecting interstate movement of goods against local burdens and repressions. We need only consider the consequences if each of the few states that produce copper, lead, high-grade iron ore,

timber, cotton, oil or gas should decree that industries located in that state shall have priority. What fantastic rivalries and dislocations and reprisals would ensue if such practices were begun! Or suppose that the field of discrimination and retaliation be industry. May Michigan provide that automobiles cannot be taken out of that State until local dealers' demands are fully met? Would she not have every argument in the favor of such a statute that can be offered in support of New York's limiting sales of milk for out-of-state shipment to protect the economic interests of her competing dealers and local consumers? Could Ohio then pounce upon the rubber-tire industry, on which she has a substantial grip, to retaliate for Michigan's auto monopoly?

Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

The State, however, insists that denial of the license for a new plant does not restrict or obstruct interstate commerce, because petitioner has been licensed at its other plants without condition or limitation as to the quantities it may purchase. Hence, it is said, all that has been denied petitioner is a local convenience—that of being able to buy and receive at Greenwich quantities of milk it is free to buy at Eagle Bridge and Salem. It suggests that, by increased efficiency or enlarged capacity at its other plants, petitioner might sufficiently increase its supply through those facilities.

The weakness of this contention is that a buyer has to buy where there is a willing seller, and the peculiarities of the milk business necessitate location of a receiving and cooling station for nearby producers. The Commissioner has not made and there is nothing to persuade us that he could have made findings that petitioner can obtain such additional supplies through its existing facilities; indeed he found that "applicant has experienced some difficulty during the flush season because of the inability of the plant facilities to handle the milk by 9:00 a. m.," the time its receipt is required by Boston health authorities unless it is cooled by the farmer before delivery, and a substantial part of it is not.

But the argument also asks us to assume that the Commissioner's order will not operate in the way he found that it would as a reason for making it. He found that petitioner, at its new plant, would divert milk from the plants of some other large handlers in the vicinity, which plants "can handle more milk." This competition he did not approve. He also found it would tend to deprive local markets of needed supplies during the short season. In the face of affirmative findings that the proposed plant would increase petitioner's supply, we can hardly be asked to assume that denial of the license will not deny petitioner access to such added supplies. While the state power is applied in this case to limit expansion by a handler of milk who already has been allowed some purchasing facilities, the argument for doing so, if sustained, would be equally effective to exclude an entirely new foreign handler from coming into the State to purchase.

The State, however, contends that such restraint or obstruction as its order imposes on interstate commerce does not violate the Commerce Clause because the State regulation coincides with, supplements and is part of the federal regulatory scheme. This contention that Congress has taken possession of "the field" but shared it with

the State, it is to be noted, reverses the contention usually made in comparable cases, which is that Congress has not fully occupied the field and hence the State may fill the void.

Congress, as a part of its Agricultural Marketing Agreement Act,[15] authorizes the Secretary of Agriculture to issue orders regulating the handling of several agricultural products, including milk, when they are within the reach of its commerce power. As to milk, it sets up, § 8c (5), 7 U. S. C. § 608c (5), a rather complicated system of fixing prices to be paid to producers through equalization pools which distribute the total value of all milk sold in a specified market among the producers supplying that market. This federal regulation was sustained and explained in *United States* v. *Rock Royal Co-operative,* 307 U. S. 533; *H. P. Hood & Sons* v. *United States,* 307 U. S. 588; see also *Stark* v. *Wickard,* 321 U. S. 288. Section 10 of the Federal Act [16] also authorizes federal officials to engage in conferences, joint hearings and cooperation with the state authorities.

New York State, in its present and antecedent statutes, has authorized its state authorities to confer with federal officials on milk control problems [17] and a series of conferences and joint hearings have been held. The two authorities formalized their collaboration in 1938 by signing a "Memorandum of the Principles of Cooperation to be Observed in the Formulation and Administration of Complementary Orders for Milk for Marketing Areas Located Within the State of New York to be Issued Concurrently by the Secretary of Agriculture and the Commissioner of Agriculture and Markets."

---

[15] Act of June 3, 1937, c. 296, 50 Stat. 246, as amended, 7 U. S. C. § 601 *et seq.*

[16] 7 U. S. C. § 610 (i).

[17] See Laws of 1937, c. 798, § 258–n.

But no federal approval or responsibility for the challenged features of this order appears in any of these provisions or arrangements. The "memorandum of the principles of cooperation" relates only to marketing areas in New York, while the marketing area served by Hood is entirely outside of New York and is controlled by Federal Order No. 4, applicable to the greater Boston market.[18] Federal Order No. 27 is applicable to the New York metropolitan market [19] and it is as to this order that the State of New York is recognized by the memorandum as entitled to consultation. There is no such financial support as was given in *Parker* v. *Brown*, 317 U. S. 341.

The Congressional regulation contemplates and permits a wide latitude in which the State may exercise its police power over the local facilities for handling milk. We assume, though it is not necessary to decide, that the Federal Act does not preclude a state from placing restrictions and obstructions in the way of interstate commerce for the ends and purposes always held permissible under the Commerce Clause. But here the challenge is only to a denial of facilities for interstate commerce upon the sole and specific grounds that it will subject others to competition and take supplies needed locally, an end, as we have shown, always held to be precluded by the Commerce Clause. We have no doubt that Congress in the national interest could prohibit or curtail shipments of milk in interstate commerce, unless and until local demands are met. Nor do we know of any reason why Congress may not, if it deems it in the national interest, authorize the states to place similar restraints on movement of articles of commerce. And the provisions looking to state cooperation may be sufficient to warrant the state in imposing regulations approved by the federal au-

---

[18] 7 C. F. R. §§ 904–904.202 (1947 Supp.).
[19] 7 C. F. R. §§ 927–927.202 (1947 Supp.).

thorities, even if they otherwise might run counter to the decisions that coincidence is as fatal as conflict when Congress acts. See *Bethlehem Steel Co.* v. *New York State Labor Relations Board,* 330 U. S. 767. It is, of course, a quite different thing if Congress through its agents finds such restrictions upon interstate commerce advance the national welfare, than if a locality is held free to impose them because it, judging its own cause, finds them in the interest of local prosperity.

When it is considered that the Federal Act was passed expressly to overcome "disruption of the orderly exchange of commodities in interstate commerce" and conditions found to "burden and obstruct the normal channels of interstate commerce," 7 U. S. C. § 601, it seems clear that we can not sustain the State's argument that its restrictions here involved supplement and further the federal scheme.

Moreover, we can hardly assume that the challenged provisions of this order advance the federal scheme of regulation because Congress forbids inclusion of such a policy in a federal milk order. Section 8c (5) (G) of the Act provides:

> "No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States." [20]

While there may be difference of opinion as to whether this authorizes the Federal Order to limit, so long as it does not prohibit, interstate shipment of milk, see *Bailey Farm Dairy Co.* v. *Anderson,* 157 F. 2d 87, 96; *Bailey Farm Dairy Co.* v. *Jones,* 61 F. Supp. 209, 221—a question upon which we express no opinion—it is clear

---

[20] 7 U. S. C. § 608c (5) (G).

that the policy of the provision is inconsistent with the State's contention that it may, in its own interest, impose such a limitation as a coincident or supplement to federal regulation.

The only federal restriction of handlers' purchases from new producers, found in § 8c (5) (B), authorizes inclusion, in orders concerning milk or milk products, of a clause providing that for deliveries made during the first sixty days a new producer shall be paid only the minimum price applicable for milk of the particular use classification, subject to adjustments not relevant here.[21]  This provision was included in the 1935 amendment,[22] "to prevent assaults upon the price structure by the sporadic importation of milk from new producing areas, while permitting the orderly and natural expansion of the area supplying any market . . . ."  S. Rep. No. 1011, 74th Cong., 1st Sess., p. 11.  And, it was added, "this is the only limitation upon the entry of new producers—wherever located—into a market, and it can remain effective only for the specified . . . period."  *Ibid.*  The bill originally provided for a ninety-day minimum price period but in conference the less restrictive sixty-day period was adopted.  H. R. Rep. No. 1757, 74th Cong., 1st Sess., p. 21.[23]

These sections and reports indicate that it is the deliberate policy of the Congress to prevent federal officers from placing barriers in the way of the interstate flow of milk.  While a statutory prohibition against federal

---

[21] See 7 U. S. C. § 608c (5) (B).

[22] The Act of August 24, 1935, 49 Stat. 750, amended the Agricultural Adjustment Act of 1933, 48 Stat. 31.  Section 8c first appeared in the 1935 Act, which was amended and reenacted by the 1937 Act, 50 Stat. 246, cited in note 15.

[23] See also H. R. Rep. No. 1241, 74th Cong., 1st Sess., pp. 7–11.  And see debates at 79 Cong. Rec. 9461–63; 9572–73; 9602–04; 11134–41; and 13022.

interference with certain phases of it may not always imply that the state too is precluded, it is obvious that a state limitation on export for the benefit of its own consumers is not authorized by this Federal Act. The purpose as expressed in § 1, 7 U. S. C. § 601, is to avoid conditions which burden and obstruct the normal channels of interstate commerce. The object of the federal program to raise and stabilize the price of products was to stimulate interstate commerce. The order of the Commissioner avows itself to have the opposite effect. It can claim neither federal sponsorship nor congressional sanction.

Since the statute as applied violates the Commerce Clause and is not authorized by federal legislation pursuant to that Clause, it cannot stand. The judgment is reversed and the cause remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

Mr. Justice Black, dissenting.

In this case the Court sets up a new constitutional formula for invalidation of state laws regulating local phases of interstate commerce. I believe the New York law is invulnerable to constitutional attack under constitutional rules which the majority of this Court have long accepted. The new formula subjects state regulations of local business activities to greater constitutional hazards than they have ever had to meet before. The consequences of the new formula, as I understand it, will not merely leave a large area of local business activities free from state regulation. All local activities that fall within the scope of this new formula will be free from any regulatory control whatever. For it is inconceivable that Congress could pass uniform national legislation capable of adjustment and application to all the local phases of interstate activities that take place in

the 48 states. See *Robertson* v. *California,* 328 U. S. 440, 449, 459–460. It is equally inconceivable that Congress would attempt to control such diverse local activities through a "swarm of statutes only locally applicable and utterly inconsistent." *Kidd* v. *Pearson,* 128 U. S. 1, 21.

*First.* New York has a comprehensive set of regulations to control the production, distribution and sale of milk. Their over-all purposes are two: (1) to promote health by maintaining an adequate supply and an orderly distribution of uncontaminated milk; (2) to promote the general welfare by saving farmer milk-producers from impoverishment and insolvency. The state legislature concluded that achievement of these goals demanded elimination of destructive competition among milk dealers. The legislature believed that while cutthroat competition among purchaser dealers temporarily raises the price of farmers' milk, the end result of the practice in New York had been economic distress for the farmers. After destructive dealer competition had driven financially weak dealers from the contest, the more opulent survivors had pushed producers' prices far below production costs. *Nebbia* v. *New York,* 291 U. S. 502, 515–516, gives a graphic description of the plight of these farmers prior to the enactment of these regulations and makes clear that the chief incentive for the regulations was the promotion of health and the general welfare by financial rehabilitation of the farmers. And despite due-process objections, the *Nebbia* case sustained the state's constitutional power to apply its law to New York dealers in order to promote the health, economic stability and general welfare of the state's people.

That part of the regulatory plan challenged here bars issuance of licenses for additional milk-handling plants if new plants would "tend to destructive competition in a market already adequately served" or would be con-

trary to "the public interest." In determining whether a milk market is "adequately served," the state follows a plan similar to the federal law in that both divide the country into "marketing areas." Under this plan, the state legislature did not attempt to prescribe one rule applicable throughout the whole state limiting the number of milk dealers or the number of their plants. A single rule of this kind would have lacked the necessary flexibility to accommodate the varying needs of markets in different parts of the state. So a state commissioner was authorized to hold hearings and make findings of fact to determine whether existing plants could adequately supply a given local producer's market or whether new plants would bring about the destructive competition among dealers that the law was designed to prevent. The commissioner's findings and orders were subject to judicial review. There is no challenge to the constitutional validity of the New York law as applied to New York milk dealers who sell milk in New York.

*Second.* Petitioner, a milk dealer, has two plants in New York. It buys milk, cools it, and ships it to Boston. It applied to the commissioner for a license to operate a third plant in the same local market area. After evidence the commissioner found that petitioner's two plants plus the others in the vicinity were adequate outlets for all the milk produced in that vicinity; some of the dealers in the area had plant capacities already in excess of the available supply. Petitioner was one of these. From this the commissioner found that more plants would bring about the kind of destructive competition against which the law was aimed. That finding is not challenged. Nor is it charged that the order was prompted by desire to prevent New York milk from going to Boston.

There was a finding that the destructive competition incident to the operation of a new plant probably would

reduce the volume of milk purchased by some existing dealers who supplied milk to certain New York cities. One of these cities had recently suffered a milk shortage. But this finding neither proves nor implies that petitioner's application was denied to keep milk from going to Boston or to aid local economic interests. In gauging the effect of an order denying an application for additional milk plants in a purchasing area, it seems essential to intelligent administration that the commissioner consider the available supply in that area in relation to the consumer demand on dealers as sellers. For if existing area plants already are unable to buy enough milk to supply their consumer demands, new plants, striving to buy a portion of the short supply, will inevitably intensify competition among purchasing dealers, thus bringing one kind of destructive competition the New York law was designed to prevent. Consequently, in determining whether new plants would tend to destructive competition, the commissioner cannot ignore a fundamental economic truth—the interrelation of supply and demand. Whether the new plants would service Troy, Boston, or elsewhere, the effect new plants would have on the available supply to existing consumers is a relevant consideration. And the New York law requires that consideration without regard to the geographical location of the consumers.

Had a dealer supplying New York customers applied for a license to operate a new plant, the commissioner would have been compelled under the Act to protect petitioner's plants supplying Boston consumers in the same manner that this order would have protected New York consumers. In protecting inter- or intra-state dealers from destructive competition which would endanger the milk farmers' price structure or the continued supply of healthful milk to the customers of existing dealers, the commissioner would be faithful to the Act's avowed pur-

poses. The commerce clause should not be stretched to forbid New York's fair attempt to protect the healthful milk supply of consumers, even though some of the consumers in this case happen to live in Troy, New York. And unless this Court is willing to charge an unfairness to the commissioner that has not been charged by petitioner or shown by the evidence, the Court cannot attribute to the commissioner an invidious purpose to discriminate against petitioner's interstate business in order to benefit local intrastate competitors and their local consumers. Of course if this were a case involving such discrimination, relief could be obtained under the principles announced in *Best & Co.* v. *Maxwell*, 311 U. S. 454.

The language of this state Act is not discriminatory, the legislative history shows it was not so intended, and the commissioner has not administered it with a hostile eye. The Act must stand or fall on this basis notwithstanding the overtones of the Court's opinion. If petitioner and other interstate milk dealers are to be placed above and beyond this law, it must be done solely on this Court's new constitutional formula which bars a state from protecting itself against local destructive competitive practices so far as they are indulged in by dealers who ship their milk into other states.

*Third.* The number of plants petitioner can have in the New York market is of concern to petitioner, to New York, and to the nation. Petitioner's business interest, however, under the *Nebbia* rule must be subordinated to the public interest. New York's concern derives from its interest in the health and well-being of its people deemed by the legislature of New York to be threatened by competitive trade practices of dealers who buy and sell milk produced in the state. That its concern is great is manifested by the state law, its background, its purposes, and its administration. The national concern, reflected in the commerce clause, flows from federal solicitude for

freedom of trade among the states. That solicitude is great.

Reconciliation of state and federal interests in regulation of commerce always has been a perplexing problem. The claims of neither can be ignored if due regard be accorded the welfare of state and nation. For in the long run the welfare of each is dependent upon the welfare of both. Injury to commercial activities in the states is bound to produce an injurious reaction on interstate commerce, and vice versa. The many local activities which are parts of interstate transactions have given rise to much confusion. The basic problem has always been whether the state or federal government has power to regulate such local activities, whether the power of either is exclusive or concurrent, whether the state has power to regulate until Congress exercises its supreme power, and the extent to which and the circumstances under which this Court should invalidate state regulations in the absence of an exercise of congressional power. This last question is the one here involved.

*Fourth. Gibbons* v. *Ogden,* 9 Wheat. 1, decided in 1824, held invalid a New York statute regulating commerce which conflicted with an Act of Congress. The Court there left undecided the question strongly urged that the commerce clause of itself forbade New York to regulate commerce. In 1847 this undecided question was discussed by Chief Justice Taney.[1] His view was that the commerce clause of itself did no more than grant power to Congress to regulate commerce among the states; that until Congress acted states could regulate the commerce; and that this Court was without power to strike down state regulations unless they conflicted with a valid federal law. This the Chief Justice thought

[1] *The License Cases,* 5 How. 504, 578–579. And see Frankfurter, *The Commerce Clause,* 50–58 (1937).

was the intention of the Constitution's framers, drawing his inference of their intent from his belief that they knew "a multitude of minor regulations must be necessary, which Congress amid its great concerns could never find time to consider and provide . . . ." [2]

In 1852 this Court rejected in part the Taney interpretation of the commerce clause. *Cooley* v. *Board of Wardens,* 12 How. 299. The opinion there stated that the commerce clause *per se* forbade states to regulate commerce under some circumstances but left them free to do so under other circumstances. The dividing line was not precisely drawn, but the Court outlined broad principles to guide future determinations of the side of the line on which commercial transactions would be held to fall. In doing so, it apparently took into consideration Mr. Chief Justice Taney's 1847 belief that absolute prohibition of all state regulation of commerce would create an area immune from any regulation at all. For in the *Cooley* case the Court held at p. 319 that the commerce clause *per se* only prohibited state regulation of local interstate commerce activities which "are in their nature national, or admit only of one uniform system." It was also held at p. 320 that the commerce clause left states free to regulate interstate commerce activities where diverse conditions incident to different customs, habits and trade practices, could best be treated and regulated by different regulations "drawn from local knowledge and

---

[2] State legislation which patently discriminates against interstate commerce has long been held to conflict with the commerce clause itself. The writer has acquiesced in this interpretation, *Adams Mfg. Co.* v. *Storen,* 304 U. S. 307, 331–332, although agreeing with the views of Chief Justice Taney that the commerce clause was not intended to grant courts power to regulate commerce even to this extent. The equal protection clause would seem to me a more appropriate source of judicial power in respect to such discriminatory laws.

experience, and conformed to local wants." Thus cautiously did the Court enter this new field of judicial power. It decided no more than that this Court in passing upon state regulations of commerce would always weigh the conflicting interests of state and nation. Moreover, implicit in the rule, as shown by what the Court said, was a determined purpose not to leave areas in which interstate activities could be insulated from any regulation at all.

*Fifth.* The basic principles of the *Cooley* rule have been entangled and sometimes obscured with much language. In the main, however, those principles have been the asserted grounds for determination of all commerce cases decided by this Court from 1852 until today. Pertinent quotations from some of these cases appear in MR. JUSTICE FRANKFURTER's dissenting opinion and he refers to others. Many of the cases have used the words "restraints," "obstructions," "in commerce," "on commerce," "burdens," "direct burdens," "undue burdens," "unreasonable burdens," "unfair burdens," "incidental burdens," etc., but such words have almost always been used, as the opinions reveal, to aid in application of the *Cooley* balance-of-interests rule.[3]

There have been some sporadic deviations from the *Cooley* principle as illustrated by *Di Santo* v. *Pennsylvania*, 273 U. S. 34. The powerful dissents of Mr. Justice Brandeis and Mr. Justice Stone, concurred in by Mr.

---

[3] Dowling, *Interstate Commerce and State Power*, 27 Va. L. Rev. 1 (1940); and see for illustration *Southern Pacific Co.* v. *Arizona*, 325 U. S. 761, 768–769; *United States* v. *Underwriters Assn.*, 322 U. S. 533, 547–549; *Cloverleaf Co.* v. *Patterson*, 315 U. S. 148, 154–155; *California* v. *Thompson*, 313 U. S. 109, 113; *Milk Board* v. *Eisenberg Co.*, 306 U. S. 346; *S. C. Hwy. Dept.* v. *Barnwell Bros.*, 303 U. S. 177, 184–191; *Hartford Indemnity Co.* v. *Illinois*, 298 U. S. 155; *Kidd* v. *Pearson*, 128 U. S. 1. And see cases collected by Mr. Justice Brandeis, in his dissenting opinion in *Di Santo* v. *Pennsylvania*, 273 U. S. 34, 39–40.

Justice Holmes, pointed out the *Di Santo* deviation. The necessity for delicate adjustment of the conflicting state and federal claims was pointed out. It was emphasized that decision on such an issue required a consideration of facts such as the nature of the regulation, the character of the business, the regulation's actual effect on interstate commerce. Mr. Justice Brandeis pointed out the dangers in deviating from these principles, and, perhaps with prophetic insight as to the future fate of the *Di Santo* case, cited a long list of cases in which such deviations had required this Court later to overrule or explain away the prior deviations. P. 43, n. 4. In *California* v. *Thompson,* 313 U. S. 109, 115–116, this Court explained away the *Di Santo* case. It could not stand, so said the Court, because it was a departure from the principle that had been recognized ever since *Cooley* v. *Board of Wardens, supra.*

In this Court, challenges to the *Cooley* rule on the ground that the rule was an ineffective protector of interstate commerce from state regulations have been confined to dissents and concurring opinions.[4] *Duckworth* v. *Arkansas,* 314 U. S. 390, 400–401; *Bob-Lo Excursion Co.* v. *Michigan,* 333 U. S. 28, 37–38, 41, 42, 45; *Independent Warehouses* v. *Scheele,* 331 U. S. 70, 85, 95. In the *Duckworth* case by application of the *Cooley* rule the majority of this Court sustained a state regulation of interstate transportation. A concurring opinion expressed the view that the Court's opinion written by Chief Justice Stone, rooted as it was in the *Cooley* principle, "let commerce struggle for Congressional action to

[4] The writer's view has been that the *Cooley* rule resulted in this Court's invalidating state statutes that should be left operative unless Congress should strike them down. See dissenting opinion in *Southern Pac. Co.* v. *Arizona,* 325 U. S. 761, 784–796. But since my views were rejected, I joined in disposition of *Morgan* v. *Virginia,* 328 U. S. 373, 386–388, by application of the *Cooley* rule.

make it free," and expressed the writer's unwillingness to follow the Court's "trend" [5] beyond the "plain requirements" of existing cases, at p. 401.

The philosophy of this *Duckworth* concurring opinion which the Court rejected, can alone support the holding and opinion today. That philosophy commends itself to many thoughtful people. Some people believe in this philosophy because of fear that judicial toleration of any state regulations of local phases of commerce will bring about what they call "Balkanization" of trade in the United States—trade barriers so high between the states that the stream of interstate commerce cannot flow over them.[6] Other people believe in this philosophy because of an instinctive hostility to any governmental regulation of "free enterprise"; this group prefers a *laissez faire* economy.[7] To them the spectre of "Bureaucracy" is more frightening than "Balkanization."

The *Cooley* balancing-of-interests principle which the Court accepted and applied in the *Duckworth* case is today supplanted by the philosophy of the *Duckworth* concurring opinion which though presented in the *Duckworth* case gained no adherents.[8] For the New York statute is killed by a mere automatic application of a new mechanistic formula. The Court appraises nothing, unless its stretching of the old commerce clause interpretation results from a reappraisal of the power and duty

---

[5] Dowling, *Interstate Commerce and State Power*, 27 Va. L. Rev. 1 (1940); Braden, *Umpire to the Federal System*, 10 U. of Chi. L. Rev. 27 (1942).

[6] Bane, *Interstate Trade Barriers*, 16 Ind. L. J. 121 (1940); and see the collection of articles on the subject of *Trade Barriers* in 9 Geo. Wash. L. Rev. 755 (1941).

[7] Melder, *The Economics of Trade Barriers*, 16 Ind. L. J. 127, 131 (1940); Reynolds, *The Distribution of Power to Regulate Interstate Carriers Between the Nation and the States*, 379 (1928).

[8] Barnett, *Interstate Commerce—State Control*, 21 Ore. L. Rev. 385, 391–392 (1942); Note, 26 Minn. L. Rev. 654, 655 (1942).

of this Court under the commerce clause. Numerous cases, for examples *Parker* v. *Brown*, 317 U. S. 341, and *Milk Board* v. *Eisenberg Co.*, 306 U. S. 346, which made judicial appraisals under the *Cooley* rule, are gently laid to rest. Their interment is tactfully accomplished, without ceremony, eulogy, or report of their demise. The ground beneath them has been deftly excavated by a soothing process which limits them to their facts, their precise facts, their "plain requirements." The vacancy left by the *Cooley* principle will be more than filled, however, by the new formula which without balancing interests, automatically will relieve many businesses from state regulation. This Court will thereby be relieved of much trouble in attempting to reconcile state and federal interests. State regulatory agencies too will be relieved of a large share of their traditional duties when they discover that bad local business practices are now judicially immunized from state regulation. But it is doubtful if the relief accorded will promote the welfare of the state or nation since Congress cannot possibly undertake the monumental task of suppressing all pernicious local business practices.

*Sixth.* The Court strongly relies on *Baldwin* v. *Seelig*, 294 U. S. 511. The crucial facts of that case were these. New York law fixed a minimum price for milk bought by New York dealers from New York farmers. Vermont's legislative policy left Vermont farmers and milk dealers free to fix milk prices by bargaining. Seelig, a New York dealer, sold milk in New York which had been bought from Vermont farmers at prices below that fixed for New York farmers by New York law. New York law forbade sale of Seelig's milk in New York because the Vermont farmers had not received the New York fixed price for their milk. New York's object was to save its farmers from competition with Vermont milk. And the Court saw the New York law as a discriminatory "barrier to

traffic between one state and another as effective as if customs duties, equal to the price differential, had been laid upon the thing transported." *Baldwin* v. *Seelig, supra,* at 521. The effect of the law, therefore, was precisely the same as though in order to protect its farmers from competition with Vermont milk, New York had imposed substantially higher taxes on sellers of Vermont produced articles than it imposed on sellers of New York produced articles. Under many previous decisions of this Court such discriminations against interstate commerce were not permitted. See *Best & Co.* v. *Maxwell,* 311 U. S. 454.

Even though the Court regarded the *Baldwin* v. *Seelig* law as discriminatory, other considerations were added to weight the scales on the side of invalidation. Its impact on Vermont economy and Vermont legislative power was weighed. To whatever extent it is desirable to reform the economic standards of Vermont, "the legislature of Vermont and not that of New York must supply the fitting remedy." *Baldwin* v. *Seelig, supra,* at 524. This is a due process concept.[9] In emphasizing the due process objectionable phase of New York's law, the Court was well within the *Cooley* philosophy.[10] Furthermore under the *Cooley* rule, aside from due process, a state's regulation that immediately bears upon nothing but activities wholly within its boundaries is far less vulnerable than one which casts burdens on activities within the boundaries of another state.[11]

---

[9] *Allgeyer* v. *Louisiana,* 165 U. S. 578; *cf. Hoopeston Co.* v. *Cullen,* 318 U. S. 313, 318–319; *Hartford Ind. Co.* v. *Delta Co.,* 292 U. S. 143, 149–150.

[10] *Morgan* v. *Virginia,* 328 U. S. 373, 386; and compare dissenting opinion at pp. 391, 394; *Bob-Lo Excursion Co.* v. *Michigan,* 333 U. S. 28, 37, n. 16, 40, 41–42.

[11] *Southern Pac. Co.* v. *Arizona,* 325 U. S. 761, 767–768, n. 2; *S. C. Hwy. Dept.* v. *Barnwell Bros.,* 303 U. S. 177, 184–186.

It was because New York attempted to project its law into Vermont that even its admitted health purpose was insufficient to outweigh Vermont's interest in controlling its own local affairs. *Baldwin* v. *Seelig, supra,* p. 524. Added to this was the Court's appraisal of the law as a plain discrimination against interstate commerce that would inescapably erect a barrier to suppress competitive sales of Vermont milk in New York, thus leading to retaliatory "rivalries and reprisals," at p: 522. Quite differently here New York has not attempted to regulate the price of milk in Massachusetts or the manner in which it will be distributed there; it has not attempted to put pressure on Massachusetts to reform its economic standards; its law is not hostile to interstate commerce in conception or operation; its purpose to conserve health and promote economic stability among New York producers is not stretched to the breaking point by an argument that New York cannot safely aid its own people's health unless permitted to trespass upon the power of Massachusetts to regulate local affairs in Massachusetts. Nor is this New York law, fairly administered as it has been, the kind that breeds "rivalries and reprisals." The circumstances and conditions that brought about invalidation of the law considered in the *Baldwin* case are too different from those here considered to rest today's holding on the *Baldwin* decision.

*Seventh. Milk Board* v. *Eisenberg Co.,* 306 U. S. 346, would control this case but for the Court's limiting that case to its precise facts. That law required a state license of all persons who handled or purchased milk within the commonwealth for sale within or without the commonwealth. It required all dealers, interstate and intrastate, to keep records and to make bonds. Dealers who sold their products within or without the state were required to pay state-fixed prices. The state granted or denied licenses on the Act's enumerated terms and suspended

or revoked them for cause. Avowed purposes of the Pennsylvania law were identical with the stated purposes of the New York law. Like New York the method chosen to achieve these purposes was protection of milk farmers from what were deemed to be the evil consequences of cutthroat competition. The law was applied against interstate dealers in Pennsylvania, who like petitioner in New York, bought, weighed, tested, and cooled milk in Pennsylvania preparatory to shipment outside the state.

The *Eisenberg* case thus sustained the power of a state to require licenses from interstate dealers and to impose conditions on their interstate commerce transactions in order to effectuate legitimate state policies. And the conditions Pennsylvania imposed were burdensome, as this Court recognized. They erected obstacles which were bound to limit the number of interstate dealers. The limited number of interstate dealers who could get and hold state licenses were compelled to incur expenses that added to the costs of state-fixed milk prices they were required to pay as a condition precedent to the state's allowing them to buy and ship out any milk at all. Pennsylvania imposed these burdens on interstate commerce to promote health and to protect its farmers from the consequences of destructive competition among dealers. This New York law was designed to promote health and to protect New York farmers from destructive competition in New York.

It requires more than invocation of the spectre of "Balkanization" and eulogy of the Constitution's framers to prove that there is a gnat's heel difference in the burdens imposed on commerce by the two laws. It cannot even be said that one regulation was "on commerce" and one was not (whatever "on commerce" means), for both affected the capacity of dealers to buy milk for interstate sales. There is this difference. The handicap

of state-fixed high-priced milk, big bonds, and large book-keeping expenses would probably reduce the volume of interstate shipments far more than the New York limitation of new plants in particular localities. True, this New York regulation might reduce the volume of milk this particular dealer might get and ship. But the commerce clause was not written to let one particular dealer's interests destroy a state's orderly marketing system.

There has certainly been no proof here that New York is wrong in believing that its law will rehabilitate farmers, induce more of them to get and stay in the milk business, and thus provide a greater New York production of better milk available for sale both in and out of New York. Should this result follow, interstate commerce will not be burdened, it will be helped. And it seems to me that here as in the *Eisenberg* case, this Court should not pit its legal judgment against a legislative judgment that is in harmony with the views of persons who have devoted their lives to a practical study of the milk problem.

*Eighth.* I think that Congress and its authorized federal agency have knowingly acquiesced in, if they have not actually encouraged and approved, enactment and enforcement of the New York law here held invalid. The New York law authorizes its administrator to act in cooperation with federal milk-control authorities and after consultation to make such supplementary orders as might be helpful in accomplishing the joint state-federal program. So also, 7 U. S. C. § 610 (i) authorizes and directs the Secretary of Agriculture to confer and hold joint hearings with the authorities of any state in order to "obtain uniformity in the formulation, administration, and enforcement of Federal and State programs relating to the regulation of the handling of agricultural commodities . . . ." The section further authorizes the Secretary to "issue orders . . . complementary to orders or

other regulations issued by such [State] authorities; and to make available to such State authorities the records and facilities of the Department of Agriculture . . . ."

In the foregoing provisions Congress manifested its purpose to subject the milk industry to two cooperating authorities: (1) state legislatures and their selected administrative authorities, and (2) the Secretary of Agriculture. Congress did far more than direct a formal, polite cooperation between New York and the Secretary of Agriculture. Recognizing the compelling necessity for a state-federal integrated regulatory system for the milk industry, Congress was careful to leave the door open for the Secretary of Agriculture and state authorities working together to formulate mutually complementary orders in the field. These complementary state-federal laws and orders were to be aimed at precisely the same evils believed to have been generated by chaotic competitive conditions in the milk industry. The objective of both laws was to help impoverished farmers. 48 Stat. 31, 7 U. S. C. § 601.

This record does not reveal the extent to which there was state-federal cooperation in connection with enactment and enforcement of the New York law here involved. Absence of a full showing of such cooperation is doubtless due to the failure of the petitioner to raise any commerce questions in the hearing before the New York Commissioner. This in itself should be enough to cause this Court, at the very least, to follow MR. JUSTICE FRANKFURTER's suggestion and remand the case. This would afford the state opportunity to develop the facts concerning federal and state cooperation. New York's law should not be condemned on the basis of abstract rhetoric about the "fathers" and the commerce clause. Surely a state is still entitled to present its side of a constitutional controversy, though perhaps today's new rule makes it an exercise in futility.

New York has presented some evidence in its brief of such state-federal cooperation. Without such showing we should assume that the Secretary has followed congressional directions. If such an assumption be not made we cannot ignore the action of Congress in selecting the Secretary of Agriculture to protect interstate commerce in milk. Congress has even given him power to limit milk shipments as between different federal marketing areas.[12] This is hardly consistent with a congressional purpose to deny the Secretary power to approve this state regulation and order complementary to his own basic program. And here there is no evidence whatever to show that fair enforcement of the New York law would limit the total volume of New York milk available for shipment into other states. The basic purpose of the New York law like that of the federal law was to protect producers from low prices on the theory that this protection would insure an adequate milk supply for inter- as well as intra-state shipments.

From the foregoing, it seems to me that the Court now steps in where Congress wanted it to stay out. The Court puts itself in the position of guardian of interstate trade in the milk industry. Congress, with full constitutional power to do so, selected the Secretary of Agriculture to do this job. Maybe this Court would be a better guardian, but it may be doubted that authority for the Court

[12] 7 U. S. C. § 608c (5) (G). This section restricts the Secretary of Agriculture's power in two respects: (1) It forbids him to "prohibit" shipment of "milk" from one federal marketing area to another. (2) It forbids him to "limit" market-to-market shipment of "milk products." The Chairman of the Committee in charge of the Act in which this provision appeared explained to the House that a failure to grant the Secretary power to "limit" milk shipments "would absolutely wreck the whole milk program." 79 Cong. Rec. 9572–9573. See also 79 Cong. Rec. 13022, 13023; *Bailey Farm Dairy Co.* v. *Anderson,* 157 F. 2d 87–96; *Bailey Farm Dairy Co.* v. *Jones,* 61 F. Supp. 209, 221–224.

to undertake the task can be found in the Constitution—even in its "great silences." At any rate, I had supposed that this Court would not find conflict where Congress explicitly has commanded cooperation.[13]

The sole immediate result of today's holding is that petitioner will be allowed to operate a new milk plant in New York. This consequence standing alone is of no great importance. But there are other consequences of importance. It is always a serious thing for this Court to strike down a statewide law. It is more serious when the state law falls under a new rule which will inescapably narrow the area in which states can regulate and control local business practices found inimical to the public welfare. The gravity of striking down state regulations is immeasurably increased when it results as here in leaving a no-man's land immune from any effective regulation whatever. It is dangerous to assume that the aggressive cupidity of some need never be checked by government in the interest of all.

The judicially directed march of the due process philosophy as an emancipator of business from regulation appeared arrested a few years ago. That appearance was illusory. That philosophy continues its march. The due process clause and commerce clause have been used like Siamese twins in a never-ending stream of challenges to government regulation. See for example, *Pacific Tel. Co.* v. *Tax Comm'n,* 297 U. S. 403, 420. The reach of one twin may appear to be longer than that of the other, but either can easily be turned to remedy this apparent handicap.

---

[13] *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202, 209; *Parker* v. *Brown,* 317 U. S. 341; *Townsend* v. *Yeomans,* 301 U. S. 441, 454; *Rice* v. *Bd. of Trade,* 331 U. S. 247, 255; *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 433–436.

Both the commerce and due process clauses serve high purposes when confined within their proper scope. But a stretching of either outside its sphere can paralyze the legislative process, rendering the people's legislative representatives impotent to perform their duty of providing appropriate rules to govern this dynamic civilization. Both clauses easily lend themselves to inordinate expansions of this Court's power at the expense of legislative power.[14] For under the prevailing due process rule, appeals can be made to the "fundamental principles of liberty and justice" which our "fathers" wished to preserve. In commerce clause cases reference can appropriately be made to the far-seeing wisdom of the "fathers" in guarding against commercial and even shooting wars among the states. Such arguments have strong emotional appeals and when skillfully utilized they sometimes obscure the vision.

The basic question here is not the greatness of the commerce clause concept, but whether all local phases of interstate business are to be judicially immunized from state laws against destructive competitive business practices such as those prohibited by New York's law. Of course, there remains the bare possibility Congress might attempt to federalize all such local business activities in the forty-eight states. While I have doubt about the wisdom of this New York law, I do not conceive it to be the function of this Court to revise that state's eco-

---

[14] Other constitutional provisions with vague contours are available as instruments for the judiciary to protect business from legislative regulation. Appealing phases of these vague contour provisions can be judicially integrated to provide a variety of techniques to accomplish a single purpose, the protection of business against legislative regulations obnoxious to courts. Under such a constitutional philosophy courts can invalidate business regulations on substantive grounds or they can put obstacles in the path of enforcement making it impossible to suppress business practices outlawed by valid legislation.

nomic judgments. Any doubt I may have concerning the wisdom of New York's law is far less, however, than is my skepticism concerning the ability of the Federal Government to reach out and effectively regulate all the local business activities in the forty-eight states.

I would leave New York's law alone.

MR. JUSTICE MURPHY joins in this opinion.

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE RUTLEDGE joins, dissenting.

If the Court's opinion has meaning beyond deciding this case in isolation, its effect is to hold that no matter how important to the internal economy of a State may be the prevention of destructive competition, and no matter how unimportant the interstate commerce affected, a State cannot as a means of preventing such competition deny an applicant access to a market within the State if that applicant happens to intend the out-of-state shipment of the product that he buys. I feel constrained to dissent because I cannot agree in treating what is essentially a problem of striking a balance between competing interests as an exercise in absolutes. Nor does it seem to me that such a problem should be disposed of on a record from which we cannot tell what weights to put in which side of the scales.

In the interest of clarity, the controlling facts in this case may thus be fairly summarized.

Hood, the petitioner, is a Massachusetts corporation engaged in supplying the Boston market with fluid milk. In New York State, on the border of Vermont and Massachusetts, it operates two milk-receiving plants to which milk is delivered by local producers and whence it is shipped to Boston without processing. These two plants—at Eagle Bridge and Salem—are quite close together. On January 30, 1946, Hood applied to the Com-

missioner of Agriculture and Markets of New York for an extension of its New York license to purchase milk which would permit it to operate an additional receiving plant at Greenwich, New York. Greenwich is ten miles from Salem and twelve miles from Eagle Bridge. Hood proposed to divert to the plant at Greenwich milk deliveries of producers living in that vicinity who were then delivering to its more distant plants at Eagle Bridge and Salem and to take on at Greenwich twenty or thirty additional producers then delivering to competing dealers in the vicinity of Greenwich.

The Commissioner of Agriculture and Markets denied Hood's application for extension of its license. In so doing, it rested its decision upon the following "conclusions":

> "If applicant is permitted to equip and operate another milk plant in this territory, and to take on producers now delivering to plants other than those which it operates, it will tend to reduce the volume of milk received at the plants which lose those producers, and will tend to increase the cost of handling milk in those plants.
>
> "If applicant takes producers now delivering milk to local markets such as Troy, it will have a tendency to deprive such markets of a supply needed during the short season. . . .
>
> "The issuance of a license to applicant which would permit it to operate an additional plant, would tend to a destructive competition in a market already adequately served, and would not be in the public interest."

Hood instituted proceedings in the Supreme Court of New York to review the order which were transferred without hearing to the Appellate Division. The Appellate Division sustained the Commissioner's action in a

*per curiam* opinion, and leave to appeal to the Court of Appeals was granted. That court considered Hood's claim that the order violated the commerce clause and denied it on the ground that "any interference with the free flow of interstate commerce was incidental only." 297 N. Y. 209, 215, 78 N. E. 2d 476, 478–79.

Some of the principles relevant to decision of this case are settled beyond dispute. One of these is that the prevention of destructive competition is a permissible exercise of the police power. *Nebbia* v. *New York,* 291 U. S. 502; *United States* v. *Rock Royal Co-operative,* 307 U. S. 533; *Sunshine Coal Co.* v. *Adkins,* 310 U. S. 381, 395. Another is that a State is not barred from licensing an activity merely because it is interstate commerce.[1] Even more basic is the principle that as to matters which do not demand that regulation be uniformly present or uniformly absent, see *Cooley* v. *Board of Wardens,* 12 How. 299, the State may impose its own requirements "even though they materially interfere with interstate commerce." *South Carolina State Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177, 188. And only recently, be it noted, this Court has characterized the buying of milk

---

[1] Among considerations of State concern which have been found sufficient to allow State licensing are the maintenance of sanitary conditions, *Milk Control Board* v. *Eisenberg Farm Products,* 306 U. S. 346; and adequate prices, see Brief of Petitioner in *Milk Control Board* v. *Eisenberg Farm Products, supra,* at pp. 20–21; control of the transportation of liquor, *Ziffrin, Inc.* v. *Reeves,* 308 U. S. 132; *Duckworth* v. *Arkansas,* 314 U. S. 390; the prevention of "fraud and overreaching" by transportation agents, *California* v. *Thompson,* 313 U. S. 109, 113; "safeguarding the interests of its [the State's] own people in business dealings with corporations not of its own chartering but who do business within its borders," *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202, 208; and protection of the public from "fraud, misrepresentation, incompetence and sharp practice" on the part of insurance agents, *Robertson* v. *California,* 328 U. S. 440, 447.

for out-of-state shipment as an "essentially local" business. *Milk Control Board* v. *Eisenberg Farm Products,* 306 U. S. 346, 352.

Behind the distinction between "substantial" and "incidental" burdens upon interstate commerce is a recognition that, in the absence of federal regulation, it is sometimes—of course not always—of greater importance that local interests be protected than that interstate commerce be not touched.

> "When Congress has not exerted its power under the Commerce Clause, and state regulation of matters of local concern is so related to interstate commerce that it also operates as a regulation of that commerce, the reconciliation of the power thus granted with that reserved to the state is to be attained by the accommodation of the competing demands of the state and national interests involved." *Parker* v. *Brown,* 317 U. S. 341, 362.

> "But the Commerce Clause does not cut the States off from all legislative relation to foreign and interstate commerce. *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177; *Western Live Stock* v. *Bureau,* 303 U. S. 250. Such commerce interpenetrates the States, and no undisputed generality about the freedom of commerce from state encroachment can delimit in advance the interacting areas of state and national power when Congress has not by legislation foreclosed state action. The incidence of the particular state enactment must determine whether it has transgressed the power left to the States to protect their special state interests although it is related to a phase of a more extensive commercial process." *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202, 209–10.

> ". . . in the necessary accommodation between local needs and the overriding requirement of freedom for

the national commerce, the incidence of a particular type of State action may throw the balance in support of the local need because interference with the national interest is remote or unsubstantial. A police regulation of local aspects of interstate commerce is a power often essential to a State in safeguarding vital local interests. At least until Congress chooses to enact a nation-wide rule, the power will not be denied to the State." *Freeman* v. *Hewit,* 329 U. S. 249, 253.

See also *Southern R. Co.* v. *King,* 217 U. S. 524, 533; *Illinois Natural Gas Co.* v. *Central Illinois Pub. Serv. Co.,* 314 U. S. 498, 506.[2]

---

[2] Every case determining whether or not a local regulation amounts to a prohibited "burden" on interstate commerce belongs at some point along a graduated scale. Considering only those decided since *Milk Control Board* v. *Eisenberg Farm Products,* 306 U. S. 346, at one end are the tax cases; since a State has other sources of revenue, the need for a tax "on" interstate commerce is hard to justify. It is to be expected, therefore, that State revenue laws should constitute the largest group of laws invalidated as "burdening" commerce. And so they do. *McCarroll* v. *Dixie Greyhound Lines,* 309 U. S. 176; *McGoldrick* v. *Gulf Oil Corp.,* 309 U. S. 414; *McLeod* v. *Dilworth Co.,* 322 U. S. 327; *Nippert* v. *City of Richmond,* 327 U. S. 416; *Freeman* v. *Hewit,* 329 U. S. 249; *Joseph* v. *Carter & Weekes Co.,* 330 U. S. 422; *Central Greyhound Lines* v. *Mealey,* 334 U. S. 653, 662. Yet there has been an increasing recognition of the States' interest in seeing that interstate commerce "pays its way," and a consequent disposition to classify the object of the tax as intrastate. *McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33; *McGoldrick* v. *Felt & Tarrant Co.,* 309 U. S. 70; *McGoldrick* v. *Compagnie Generale Transatlantique,* 309 U. S. 430; *Nelson* v. *Sears, Roebuck & Co.,* 312 U. S. 359; *Nelson* v. *Montgomery Ward & Co.,* 312 U. S. 373; *Northwest Airlines* v. *Minnesota,* 322 U. S. 292; *General Trading Co.* v. *State Tax Comm'n,* 322 U. S. 335; *International Harvester Co.* v. *Department of Treasury,* 322 U. S. 340; *Independent Warehouses* v. *Scheele,* 331 U. S. 70; cf. *Aero Mayflower Transit Co.* v. *Board of R. Comm'rs,* 332 U. S. 495. By the same principle, a regulation which makes a good deal of trouble for

The Court's opinion deems the decision in *Baldwin* v. *Seelig*, 294 U. S. 511, as most relevant to the present controversy. But it is the essential teaching of that case that "considerations of degree" determine the line of decision between what a State may and what a State may not regulate, when what is sought to be regulated is part of the shuttle-work of interstate commerce. *Id.* at 525. What was there held and all that was held was accurately defined in *Milk Control Board* v. *Eisenberg Farm Products,* 306 U. S. 346, 353: "In *Baldwin* v. *G. A. F. Seelig,* 294 U. S. 511, this Court condemned an enactment aimed solely at interstate commerce attempting to affect and regulate the price to be paid for milk in a sister state, and

---

an interstate railroad must be struck down in the absence of any very convincing showing that the regulation is a reasonable response to a serious local need. *Southern Pacific Co.* v. *Arizona*, 325 U. S. 761; *Morgan* v. *Virginia*, 328 U. S. 373. But a more impressive showing of such a contribution on the one hand and a less persuasive demonstration of inconvenience on the other has brought about the opposite result. *Terminal Railroad Assn. of St. Louis* v. *Brotherhood of Railroad Trainmen*, 318 U. S. 1; *Bob-Lo Excursion Co.* v. *Michigan*, 333 U. S. 28. Where motor carriers are concerned, a State is regarded as having a proprietary interest in its highways which justifies a generally more aggressive assertion of its self-interest. *Welch Co.* v. *New Hampshire*, 306 U. S. 79; *Clark* v. *Paul Gray, Inc.*, 306 U. S. 583; *Maurer* v. *Hamilton*, 309 U. S. 598. And the protection of its own citizens through maintenance of high standards of business dealing by such regulations as those involved in *California* v. *Thompson*, 313 U. S. 109; *Union Brokerage Co.* v. *Jensen*, 322 U. S. 202; and *Robertson* v. *California*, 328 U. S. 440, is a matter of local concern that has been given almost as much latitude as the protection of health, *Clason* v. *Indiana*, 306 U. S. 439. But at the opposite extreme from revenue measures, perhaps, is control of the transportation of intoxicating liquor, in the name of which quite confining hobbles have been put upon interstate commerce and sustained under the Commerce Clause, without resorting to the Twenty-first Amendment. *Ziffrin, Inc.* v. *Reeves*, 308 U. S. 132; *Duckworth* v. *Arkansas*, 314 U. S. 390; *Carter* v. *Virginia*, 321 U. S. 131.

we indicated that the attempt amounted in effect to a tariff barrier set up against milk imported into the enacting state." The nakedness of New York's purpose to reach into Vermont was ill-concealed by the tenuous justification that if Vermont farmers got cheap prices for their milk they would be tempted to save the expense of sanitary precautions and thereby affect the health of New York consumers. "If New York, in order to promote the economic welfare of her farmers, may guard them against competition with the cheaper prices of Vermont, the door has been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation." 294 U. S. at 522. But guarding against out-of-state competition is a very different thing from curbing competition from whatever source. A tariff barrier between States, moreover, presupposes a purpose to prefer those who are within the barrier; where no such preference appears there can be no justification for reprisals and there is consequently little probability of them. In the determination that an extension of petitioner's license would tend to destructive competition, the fact that petitioner intended the out-of-state shipment of what it bought was, so far as the record tells us, wholly irrelevant; under the circumstances, any other applicant, no matter where he meant to send his milk, would presumably also have been refused a license.

As I see the central issue, therefore, it is whether the difference in degree between denying access to a market for failure to comply with sanitary or book-keeping regulations and denying it for the sake of preventing destructive competition from disrupting the market is great enough to justify a difference in result. But for that difference in degree, the judgment below would fully rest on the *Eisenberg* case. If, on the other hand, petitioner's competitors were like itself engaged in interstate com-

merce, *Buck* v. *Kuykendall*, 267 U. S. 307, and *Bush &
Sons Co.* v. *Maloy*, 267 U. S. 317, would be powerful prece-
dents in favor of reversal.   See also *Lemke* v. *Farmers
Grain Co.*, 258 U. S. 50; *Shafer* v. *Farmers Grain Co.*, 268
U. S. 189.

This case falls somewhere between these most nearly de-
cisive authorities.   It is closer to the *Buck* and *Bush*
cases than to the *Eisenberg* case in that the denial of a
license to enter a market because the market is "ade-
quately served" imposes a disqualification beyond the
power of the applicant to remove.   In that respect the
effect upon the free flow of commerce is more enduring
than is the case where all that is required is compliance
with a local regulation.   The State's interest in restrict-
ing competition, moreover, is less obvious than its interest
in preserving health or insuring probity in business deal-
ings.   Yet the commerce involved in the *Buck* and *Bush*
cases—the operation of busses between Seattle, Washing-
ton, and Portland, Oregon—was exclusively interstate.
Here, however, it does not appear that any of Hood's
competitors sent milk out of the State, and, in fact, only
about 8% of New York's entire production of milk is
sent out.[3]   In this respect the case resembles the *Eisen-
berg* case, in which it appeared that only slightly more
than 10% of the milk produced in Pennsylvania was
exported.   306 U. S. at 350.   In upholding the State's
licensing power in that case, the Court remarked that
this percentage was "only a small fraction of the milk
produced by farmers in Pennsylvania" and concluded that
as a consequence "the effect of the law on interstate
commerce is incidental."   *Id.* at 353.   But comparison
could be carried further and still the similarities and
dissimilarities of the facts in the record before us to the

[3] For this information I am indebted to the Department of Agri-
culture of the United States.

*Eisenberg* case and the *Buck* and *Bush* cases would be inconclusive. In an area where differences of degree depend on slight differences of fact, precedent alone is an inadequate guide.

It is argued, however, that New York can have no interest in the restriction of competition great enough to warrant shutting its doors to one who would buy its products for shipment to another State. This must mean that the protection of health and the promotion of fair dealing are of a different order, somehow, than the prevention of destructive competition. But the fixing of prices was a main object of the regulation upheld in the *Eisenberg* case, and it is obvious that one of the most effective ways of maintaining a price structure is to control competition.[4] The milk industry is peculiarly subject to internecine warfare, as this Court recognized in sustaining against due-process attack the precursor of New York's present milk-control law. *Nebbia* v. *New York,* 291 U. S. 502. A picture of ruthless and wasteful competition was painted in that case as in each of the other cases in which the Court has upheld the regulation of the milk industry. *United States* v. *Rock Royal Co-operative,* 307 U. S. 533; *H. P. Hood & Sons* v. *United States,* 307 U. S. 588; *United States* v. *Wrightwood Dairy Co.,* 315 U. S. 110. And,

---

[4] Thus, in the Interstate Commerce Act of 1920, Congress gave the Interstate Commerce Commission power to limit competition both by withholding certificates of public convenience and necessity and by permitting consolidations beyond the reach of the antitrust laws and at the same time gave it power to prescribe minimum rates; the two forms of control supplement each other. See 41 Stat. 477–478, as amended, 49 U. S. C. § 1 (18), (19), (20); 41 Stat. 480–481, as amended, 49 U. S. C. § 5 (11); 41 Stat. 484–85, as amended, 49 U. S. C. § 15 (1); Biklé, *Power of the Interstate Commerce Commission to Prescribe Minimum Rates,* 36 Harv. L. Rev. 5, 26; see also Mr. Justice Brandeis, dissenting in *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, 280, 308–10, and authorities there cited. Compare the Miller-Tydings Act, 50 Stat. 693, 15 U. S. C. § 1.

so far as appears, State action to maintain the price structure in conjunction with complementary regulation by the Secretary of Agriculture is no less necessary for the dairy industry than for the raisin industry. Compare *Parker* v. *Brown,* 317 U. S. 341; see *United States* v. *Rock Royal Co-operative, Inc.,* 307 U. S. 533, 548–49. In view of the importance that we have hitherto found in regulation of the economy of agriculture, I cannot understand the justification for assigning, as a matter of law, so much higher a place to milk dealers' standards of bookkeeping than to the economic well-being of their industry.

As matters now stand, however, it is impossible to say whether or not the restriction of competition among dealers in milk does in fact contribute to their economic well-being and, through them, to that of the entire industry. And if we assume that some contribution is made, we cannot guess how much. Why, when the State has fixed a minimum price for producers, does it take steps to keep competing dealers from increasing the price by bidding against each other for the existing supply? Is it concerned with protecting consumers from excessive prices? Or is it concerned with seeing that marginal dealers, forced by competition to pay more and charge less, are not driven either to cut corners in the maintenance of their plants or to close them down entirely? Might these consequences follow from operation at less than capacity? What proportion of capacity is necessary to enable the marginal dealer to stay in business? Could Hood's potential competitors in the Greenwich area maintain efficient and sanitary standards of operation on a lower margin of profit? How would their closing down affect producers? Would the competition of Hood affect dealers other than those in that area? How many of those dealers are also engaged in interstate commerce? How much of a strain would be put on the price structure maintained by the State by a holding that it cannot regulate

the competition of dealers buying for an out-of-state market? Is this a situation in which State regulation, by supplementing federal regulation, is of benefit to interstate as well as to intrastate commerce?

We should, I submit, have answers at least to some of these questions before we can say either how seriously interstate commerce is burdened by New York's licensing power or how necessary to New York is that power. The testimony of the dealers with whom Hood seeks to compete is too inexplicit to supply the answers. Since the needed information is neither accessible to judicial notice nor within its proper scope, I believe we should seek further light by remanding the case to the courts of the State. It is a course we have frequently taken upon records no more unsatisfactory than this one. Compare *Chastleton Corp.* v. *Sinclair,* 264 U. S. 543; *Hammond* v. *Schappi Bus Line,* 275 U. S. 164; *Borden's Farm Products Co.* v. *Baldwin,* 293 U. S. 194; *Polk Co.* v. *Glover,* 305 U. S. 5; *Gibbs* v. *Buck,* 307 U. S. 66; *Mayo* v. *Canning Co.,* 309 U. S. 310—all cases remanded to avoid constitutional adjudication without adequate knowledge of the relevant facts.

Nor should we now dispose of the case upon the claim that New York cannot discriminate against interstate commerce by keeping its milk for absorption by "local markets such as Troy." In support of this claim reliance is placed on *Oklahoma* v. *Kansas Natural Gas Co.,* 221 U. S. 229, and *Pennsylvania* v. *West Virginia,* 262 U. S. 553, and there is much force in the argument that if a State cannot keep for its own use a natural resource like gas, as it can keep its wild game, *Geer* v. *Connecticut,* 161 U. S. 519; see *New York ex rel. Silz* v. *Hesterberg,* 211 U. S. 31, 41, then *a fortiori* it cannot prefer its own inhabitants in the consumption of a product that would not have come into existence but for its commercial value. But compare *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245; *Oliver Iron Mining Co.* v. *Lord,* 262

U. S. 172. It is only as to this aspect of the case, at any rate, that I can see the relevance of *Baldwin* v. *Seelig,* 294 U. S. 511, as dealing with what is characterized as "the converse of the present situation." Support is also sought in *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1, and *Toomer* v. *Witsell,* 334 U. S. 385, but in these cases what the State had done was to halt for the benefit of local processors a product already moving in interstate commerce without entirely withholding the product from interstate commerce.

Broadly stated, the question is whether a State can withhold from interstate commerce a product derived from local raw materials upon a determination by an administrative agency that there is a local need for it. For me it has not been put to rest by *Pennsylvania* v. *West Virginia, supra.* More narrowly, the question is whether the State can prefer the consumers of one community to consumers in other States as well as to consumers in other parts of its own territory. It is arguable, moreover, that the Commissioner was actuated not by preference for New York consumers, but by the aim of stabilizing the supply of all the local markets, including Boston as well as Troy, served by the New York milkshed. It may also be that he had in mind the potentially harmful competitive effect of efforts by dealers supplying the Troy market to repair, by attracting new producers, the aggravation of Troy's shortage which would result from the diversion to Boston of part of Troy's supply. These too are matters as to which more light would be needed if it were now necessary to decide the question.

In the view I take of the issue of destructive competition, however, this question need not now be decided. It is impossible to say from a reading of the opinions below that the Commissioner's finding that extension of Hood's license would tend to destructive competition

would not by itself have been a sufficient basis for his order; and it is a basis which evidence adduced upon remand might put upon solid constitutional ground. A decision at this stage of the question of preferment of local needs, assuming that the record presents it, would prove to be purely advisory, therefore, if when the case came back to the State court, it found the order adequately supported by the justification of preventing destructive competition. It may be answered, to be sure, that the State would have no reason to decide whether or not the latter justification was adequate in the absence of an indication by this Court that the former—the retention of locally needed milk—is constitutionally invalid. And such an indication would amount to decision of the very constitutional issue professedly left open. To which my reply would be that it is a very different thing to recognize the difficulty of a constitutional issue and to point out circumstances in which it would not arise than it is to decide the issue.

My conclusion, accordingly, is that the case should be remanded to the Supreme Court of Albany County for action consistent with the views I have stated.